IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

BLOCK FINANCIAL CORPORATION, )
)
           Plaintiff, )
)
vs. )   Case No. 01-1007-CV-W-ODS
)
LENDINGTREE, INCORPORATED, )
)
           Defendant. )

## CLAIM CONSTRUCTION ORDER

Plaintiff alleges Defendant infringed its Patent No. 6,014,645 entitled "Real-Time Financial Card Application System" ("the '645 Patent"). On June 3, 2002, Defendant filed a Request for Reexamination of the '645 Patent with the United States Patent & Trademark Office ("PTO"), contending certain relevant prior art had not been considered by the PTO when it initially examined the '645 Patent. The PTO completed its reexamination in November 2006 and republished the '645 Patent with certain amendments: Claims 1-10 were cancelled, Claims 11-22, 26-31, and 33 were allowed, Claims 23-25 and 32 were allowed as amended, and new Claims 34 and 35 were allowed.

The case was stayed while the PTO acted on Defendant's Request for Reexamination, and the stay was lifted in early December 2006. Now pending are the parties' competing arguments regarding construction of certain claims within the re-issued '645 Patent. Both parties have requested a hearing on these issues, but the materials they have submitted are sufficient to address the issues and obviate the need for a hearing.

### I. Standard for Claim Construction

A patent infringement analysis requires two steps: proper construction of the asserted claim and a determination of whether the accused method or product infringes

the asserted claim as properly construed. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581-82 (Fed. Cir.1996). In determining the proper construction of a claim, 'the court should look first to the intrinsic evidence of record, *i.e.* the patent itself, including the claims, the specification, and if in evidence, the prosecution history." Id. at 1582. The court should begin with the language of the claims themselves, which defines the scope of the protected invention. York Products., Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996). The significance of claims in defining a patent has been expressed as follows:

> The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which 'particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention.' 35 U.S.C. § 112. It is to these wordings that one must look to determine whether there has been infringement. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them.

E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988) (quoting Autogiro Co. of America v. United States, 384 F.2d 391(Ct. Cl. 1967)).

Claim terms are to be given their ordinary and accustomed meaning. Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir.1999). There are two instances in which a court may be compelled to give the definition of a term a meaning other than the ordinary and accustomed one. First, a patentee may choose to be his own lexicographer by clearly stating the special definition of the term in the patent specification or file history. Id. at 990. The second arises when the terms chosen by the patentee "so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used." Id. Ambiguities in a claim should be construed against the patentee because the applicant could have prevented the ambiguities through clearer claim drafting. Hoganas AB v. Dresser Indus., 9 F.3d 948 (Fed. Cir.1993).

2

The court next looks to the patent specification to aid in defining the terms used in the claims. The specification contains a written description of the invention that must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Vitronics, 90 F.3d at 1582. Consequently, the specification is "always highly relevant to the claim construction analysis" and "is usually dispositive; it is the single best guide to the meaning of a disputed term." Id.; see E.I. du Pont de Nemours & Co., 849 F.2d at 1433 (stating that the specification can supply understanding of unclear terms, but should never trump the clear meaning of the claim terms). The court also may consider the prosecution history of the patent, if it is in evidence. Vitronics, 90 F.3d at 1582. The prosecution history can and should be used to understand the language in the claim, but it cannot be used to "enlarge, diminish, or vary" the terms in the claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir.1995)(en banc), aff'd 517 U.S. 370 (1996).

Intrinsic evidence is "the most significant source of the legally operative meaning of the disputed claim language" and, ordinarily, is sufficient to resolve any ambiguities and determine the meaning of disputed claim terms. Vitronics, 90 F.3d at 1582-83. When the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence for purposes of claim construction. Id. at 1583. However, a court may rely on extrinsic evidence – that is, "evidence external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles" – to interpret claims if claim language "remains genuinely ambiguous after consideration of the intrinsic evidence." Bell & Howell Document Management Prods. Co. v. Altek Sys., 132 F.3d 701, 706 & n.5 (Fed. Cir.1997) (quotation omitted). Extrinsic evidence may be considered only to assist in the courts understanding of the patent, not to vary or contradict the claim terms. Markman, 52 F.3d at 981.[1]

---

[1]Consistent with this limited role for extrinsic evidence, "it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999). The use of extrinsic evidence for this "confirming purpose" is particularly

3

II. Disputed Terms

*A. "Financial Card"*

      This term is used throughout the '645 patent. Plaintiff suggests the proper definition of the phrase is "any medium issued to a holder that provides access to financial benefits and resources." The Court agrees that Defendant's definition – "a tangible piece of plastic or similar material issued by a financial institution that authorizes the cardholder to purchase goods and services on credit or by debiting a bank account, for example, a credit card or debit card" – is more consistent with the intrinsic evidence.

      Plaintiff's definition utilizes the broader – and more ambiguous – term "medium." This is an attempt to define an ordinary term that is readily understood in a manner that improperly expands the meaning beyond its customary understanding. A "financial card" is not a technical term; it is one understood by ordinary people, and the Court has little difficulty concluding that the ordinary meaning of this phrase refers to a tangible piece of plastic or other material, possession and ownership of which entitles the owner to credit or other sources of money.

      This ordinary understanding of the phrase is confirmed by its usage in the patent and other components of the prosecution history. The '645 Patent's Abstract describes the invention as a "system . . . for presenting financial card (e.g., credit card, debit card) offers to potential customers." The Background of the Invention compares the invention to the use of direct mail campaigns to solicit customers, and observes the shortcomings of such efforts include the need for prospective customers to "complete the applications manually, mail them back to the financial institutions, wait for them to be processed, *and then wait for the financial card to arrive in the mail.*" Col. 1, lines 47-51 (emphasis supplied). The Detailed Description of Preferred Embodiments ("Preferred

---

appropriate "with respect to technical terms, as opposed to non-technical terms" because the court "must also interpret the technical aspects of the document, and indeed its overall meaning, from the vantage point of one skilled in the art." Id.

4

Embodiments") summarizes the process as concluding when "[t]he financial institution . . . processes the application and makes arrangements to send the financial card to the applicant."  Col. 5, lines 3-5.  The Summary of Invention describes the final step of the process as occurring when "a financial card in accordance with accepted offer terms is sent to the user."  Col. 2, lines 28-29.  This is reiterated in Claim 25, which consists of "[t]he method of claim 24 further comprising the step of sending to said applicant a financial card in accordance with said offer accepted by said applicant."  Col. 8, lines 18-20.  All of these references contemplate the "financial card" as a tangible item, and further contemplate the receipt of the financial card as both a necessary part of, and the culmination of, the process.  In context, the card does not merely represent a token confirming a financial relationship, but is the means by which financial transactions are to be conducted.  Therefore, not all acquisitions of credit (or other accesses to money) are described; only those that can be accessed via the use of a "financial card" are described.

Some of Plaintiff's statements during the initial examination process confirm the meaning gleaned from the patent itself.  The PTO initially indicated it was rejecting certain claims because it regarded a financial card as "an abstract concept" and "merely a representation of the abstraction and therefore merely a model."  In insisting "that the distribution, review, and acceptance or rejection of financial card offers is a real world activity," Plaintiff discussed current practices in the credit card industry and noted "[i]t is very difficult for credit card companies to determine if their marketing efforts are effective and whether they are soliciting appropriate candidates."  Amendment to Patent Application filed February 2, 1999.  This is merely one example; Plaintiff's response to the PTO is replete with references to the "credit card industry."  At no time did Plaintiff suggest its invention could be used for other financial products, nor did Plaintiff utilize a term with greater breadth than "financial card."  Indeed, to now argue for a more abstract understanding of the phrase appears inconsistent with the position Plaintiff took to persuade the PTO to reverse its initial rejection of the patent.

The Court also notes the '645 Patent, as approved on reexamination, included new claims 34 and 35.  New Claim 34 consists of "[t]he method of claim 11 wherein said

financial card is selected from the group consisting of credit cards and debit cards."
Reexamination Certificate, Col. 2, lines 13-15. Claim 11 refers to "[a]n electronic method for applying for a financial card comprising" certain specified steps. Col. 7, lines 18-19. In supporting Claim 34 before the PTO, Plaintiff explained that "New Claim 34 depends from claim 11 and is directed to the type of financial cards for which an applicant may apply." Plaintiff's Response to Official Action dated December 3, 2003 at 5 (hereafter "Plaintiff's 2003 Response"). Thus, in declaring the invention selects financial cards from credit cards and debit cards – and not from anything else – the definition of financial cards is limited in the manner indicated by the Court.

Finally, by means of confirmation, the Court observes the prior art's use of the phrase is consistent with the Court's interpretation. See Arthur A. Collins, Inc. v. Northern Telecom Ltd., 216 F.3d 1042, 1044-45 (Fed. Cir. 2000) ("Even when prior art is not cited in the written description or the prosecution history, it may assist in ascertaining the meaning of a term to a person skilled in the art."). For instance, Patent No. 5,619,559 –Financial Card Authorization System – "relates generally . . . to a system for authorization of financial card transactions." The Background and Summary of the Invention explains that "[f]inancial cards, usually credit cards, are commonly used by purchasers in retail establishments," and proceeds to explain the use of an electronic device to obtain information from the card and transmit it to a financial institution to insure verification of the card and approval for the transaction. Col. 1, lines 14-28. Patent No. 5,038,022 – Apparatus and Method for Providing Credit for Operating a Gaming Machine – describes a device that "enables the player to obtain credit without having to leave his place at the [gaming] machine with the use of a financial card of the type such as any well known credit card or a debit card such as an ATM card." Col. 3, lines 15-19. The patent elsewhere discusses use of an electronic reader that transfers data to and from the magnetic strip on the card. These and other examples[2] confirm not only that a financial card is a tangible object, but also that the tangible object is more

---

[2] A non-exhaustive list of additional prior art using the term "financial card" in the same or similar manner includes Patent Numbers 5,530,232, 5,884,289, 5,608,203 and 5,650,604.

6

than a mere talisman confirming a contractual relationship between the customer and the financial institution.

Plaintiff contends the term "financial card" should be given a broad meaning. Even if the meaning is broad, it is not limitless or malleable, and is not amenable to the breadth Plaintiff would accord it. Plaintiff suggests it could have explicitly limited the phrase in the manner Defendant suggests, which is true – but this does not mean the definition of "financial card" is not *already* limited in light of the meaning it already has.

Plaintiff also contends the PTO understood the term to be as broad as Plaintiff now suggests, but the Court is not persuaded. First, Plaintiff points to the Examiner's initial rejection on reexamination of all the '645 Patent's claims based on Patent No. 5,878,403 – Computer Implemented Automated Credit Application Analysis and Decision Routing System (referred to by the parties as either "the '403 Patent" or "DeFranscisco"). DeFranscisco's Summary of the Invention describes "a centralized credit application entry and routing system which accepts applications from, for example, automotive dealerships, electronically and selectively forwards them to funding sources, including funding sources having computerized credit application systems." Col. 8, lines 60-67. In seeking reexamination of the '645 Patent, Defendant argued before the PTO that DeFranscisco already broadly described or anticipated all computerized applications for credit, including the '645 Patent. Plaintiff discerns some meaning from the initial rejection of the '645 Patent based on DeFranscisco, contending that because DeFranscisco did not involve a "tangible plastic card" the Examiner must have understood the '645 patent also did not require a "tangible plastic card." The Court believes Plaintiff reads too much into the sequence of events. Plaintiff's invention can be understood as a means for applying for a particular type or form of credit. In citing DeFranscisco, the PTO indicated Plaintiff's invention was anticipated and embraced by a prior invention designed to allow for the computerized application for a broader universe of credit, regardless of whether a financial card is involved. This is supported by language from DeFranscisco, most notably where it states "[t]he present invention allows a bank to have one standardized network and application interface . . . however as would be readily appreciated by one skilled in the art, this can be expanded

7

to include non-automotive customers." Col. 31, lines 36-40. The involvement of a "financial card" was simply not relevant to the PTO's citation to DeFranscisco.[3] Moreover, the PTO – at Plaintiff's urging – reversed itself and determined DeFranscisco did not anticipate the '645 Patent. Assuming any meaning can be gleaned from the PTO's initial position, that meaning ceased to be relevant when the PTO's position changed.

Finally, Plaintiff relies on another communication from the PTO dated July 16, 2004, that rejected certain claims in the '645 Patent due to obviousness. On page four the PTO referenced that portion of DeFranscisco indicating "'[e]ach funding source is able to send back additional information, such as score, grade, etc., . . . . There is also a comment field to enter more complex things, for example, a list of rate/term options.' Col. 13, lines 65- Col. 14 line 2." The PTO then referred to Figure 3Q from DeFranscisco "which shows financial card (i.e. loan) term data from a plurality of financial institutions." This reference does not clearly indicate the PTO interpreted "financial card" as coextensive with or more broadly than the word "loan." In fact, considering the context, it appears the PTO considered the term "loan" to be broader than and encompassing of "financial card," such that a "financial card" is only one type of a loan arrangement. At best, the PTO's usage on July 16, 2004, is ambiguous, and is insufficient to overcome the other clear sources cited above.

### B. "Financial Card Terms"

The parties' competing definitions of this phrase are remarkably similar. Plaintiff suggests the phrase refers to "terms that relate to a financial card offer, e.g., type of offer, interest rate, fees, amounts, etc." Defendant advances a definition limited to

---

[3]Plaintiff insists Defendant must explain its "position shift." The Court discerns no position shift. Defendant initially contended DeFranscisco is so broad that it encompassed Plaintiff's invention. That position was rejected because, essentially, Plaintiff's invention is different from DeFranscisco. Defendant now contends the scope of Plaintiff's invention is narrower than Plaintiff asserts. These positions are not inconsistent.

8

"material terms of a financial card offer (such as APR, annual fees, etc.) that are pre-set by each financial institution and can be presented to consumers." The crux of Defendant's argument seems to be its belief that the phrase is limited to terms of the card offered to customers, and not to requirements or restrictions imposed by the financial institution. Defendant's Markman Brief at 16. Plaintiff does not attempt to include such concepts within the rubric of "financial card terms," but insists the phrase may "include detailed information concerning how the applicant can proceed with the transaction" or "details about the incentive program involved with the offer." Plaintiff's Reply Brief at 15. The Court agrees with both parties.

Language in the '645 Patent suggests the "terms" consist of information perused and considered by the consumer, not the financial institution. For instance, "[t]he applicant may peruse, via the computer display, the 'federal box' and other details of each of the offers to find the one that is most attractive . . . ." Col. 4, lines 65–67. Claim 28 comprises an apparatus "for presenting to said applicant . . . financial card term data . . . ." Col 8, lines 61-63. This understanding is further confirmed by Plaintiff's explanation to the PTO. Plaintiff's 2003 Response at 19. In the absence of any argument to the contrary, the Court agrees the phrase "financial card terms" does not include eligibility policies or requirements imposed by the financial institution. Finally, without disagreement from Plaintiff, Defendant contends financial card terms are pre-set by the financial institution for presentation to consumers. In fact, Plaintiff does not even address this aspect of Defendant's argument, and it serves to reinforce the limitation acknowledged above.

On the other hand, aspects of Defendant's definition are unduly narrow. There is no support for further limiting "financial card terms" to the interest rate, APR, annual fees, and other information specifically detailed as examples in various places within the Patent. E.g., Col. 4, lines 31-43.

With these conclusions, "financial card terms" are "terms that relate to a financial card offer, e.g., type of offer, interest rate, fees, APR, credit limit, incentive programs, etc., that are pre-set by the financial institution and presented to consumers for consideration in deciding whether to accept the offer." This definition contains the

9

breadth necessary (and to which Plaintiff is entitled) to include information about the offer that may be important or enticing to a potential customer. It also excludes requirements imposed by the financial institutions before a particular offer may be presented to a particular consumer.

### C. "Ratings"

The parties dispute the meaning of the word "ratings" and the various phrases utilizing that word. Part of the difficulty is that the word is used in two broad contexts: ratings assigned to consumers and ratings assigned to financial card offers or data.

a. consumer ratings

Defendant suggests all phrases referring to consumer ratings should be defined the same, and the appropriate definition is "a letter grade and a numerical score (e.g., A-760) assigned to the applicant calculated based on the application data." In other words, all customer ratings must have both a letter grade and a numerical score. This limitation is not justified by the intrinsic evidence.

Critical to Defendant's argument is the meaning and importance of certain provisions in the Preferred Embodiments.

> A 'grading system' process may be employed which uses the application data, as well as other data, as input to determine which financial card offers may be presented to the applicant. *Preferably*, the grading system assigns a grade/score to the applicant by using the application data and other information such as credit bureau data to derive a letter grade and a numerical score (e.g., A-760). The assigned grade/score may then be used to search each participating financial institution's selection criteria to locate the offers that may be presented to the applicant. *Preferably*, a financial institution's selection criteria are organized in a matrix that associates financial card term data with a minimum grade/score combination. *For example*, a bank may have the following selection matrix.

10

Col. 4, lines 17-29 (emphasis supplied). There follows a sample table assigning a "grade" to various "score" ranges, with corresponding offers (and specified terms) for each grade/score range (the "Table"). Defendant reads this passage as requiring the customer rating – regardless of the phrase actually used to refer to the customer rating – consist of a letter and number combination. However, the form of the rating described in the Preferred Embodiment is an example; the rating is not required to take any particular form. Examples set forth in the Preferred Embodiment cannot limit the scope of the Claims. E.g., Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1362 (Fed. Cir. 2000).

Patent '645's claims also defeat Defendant's narrow construction and support Plaintiff's interpretation. Claim 11 identifies an electronic method comprised of several steps, one of which is "assigning a rating to [the] applicant." Col. 7, line 28. Several claims depend on Claim 11 and further limit the definition of the rating assigned to an applicant. For instance, Claim 14 is "[t]he method of claim 11 wherein said rating is a financial risk rating." Col. 7, lines 41-42. Narrower still is Claim 15, which consist of "[t]he method of Claim 11 wherein said rating is a grade and score combination." Col. 7, lines 43-44. Claims 14 and 15 are dependent claims and thus cannot mean exactly the same thing as Claim 11 (the claim upon which they depend). E.g., Nazomi Communications, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1370 (Fed. Cir. 2005). Therefore, Defendant's definition cannot be accepted because it effectively equates Claims 14 and 15 with Claim 11, rendering them redundant.

Defendant also insists that the grade/score must be calculated, but even if this is true this does not mean the grade/score must take any particular form. Defendant believes the requirement of a calculation excludes the possibility that a financial institution will "borrow a preexisting value or measure from one aspect of the borrower's financial or credit profile – such as an applicant's credit score or income level – and compare that to a single lender criteria." Defendant's Markman Brief at 19. A necessary corollary of this argument is the existence of a list of criteria that *must* be considered in establishing the rating, but no such list exists. In any event, the extent of effort necessary to conduct a "calculation" is beyond the scope of the present

11

discussion. Defendant's proffered definition of "rating" goes further than necessary to impose a calculation requirement – assuming such a requirement exists – because the grade/score can take other forms and still be the product of a calculation as posited by Defendant.

Defendant also argues its interpretation is consistent with the prosecution history. In explaining its final decision on the reexamination, the PTO approved Claims 11-20 and 34 and explained that it "interprets the rating assigned to the applicant to read the grade/score assigned to the applicant . . . as exemplified and disclosed in col. 4 L 20-43 of the specification," referring to the Table referenced in the discussion of the Preferred Embodiments, above. Defendant correctly observes Plaintiff did not object or otherwise respond to this understanding and so must be deemed to have accepted it. E.g., Fuji Photo Film Co., Ltd v. International Trade Comm'n, 386 F.3d 1095, 1100 (Fed. Cir. 2004). However, nothing in this sentence suggests the format or components of the grade/score, so it sheds no light on the matter. The Table is offered as an example, not as a requirement. In context, (the entirety of which is not set forth here in the interest of brevity), the sentence only explains the PTO's understanding of the difference between (1) the rating assigned to the applicant and (2) the criteria or "chart" used to determine whether a particular customer is qualified for the offer in question.

Plaintiff suggests the term "rating," as related to an applicant, means "a value or measure assigned to the applicant." This is an accurate definition of the term, and allows for consistency between the various claims comprising the patent. Claim 11 describes an electronic method comprised of several steps, one of which involves assigning some value or measure to the applicant. Claim 11 is further narrowed by Claim 14, which specifies that the value assigned in Claim 11 is some measure of financial risk. Claim 15 further narrows the term. As between Plaintiff's definition and Defendant's definition, Plaintiff's definition has greater support in the record.[4]

---

[4]While it is tempting to include in the definition a requirement that the rating be intended to reflect the financial risk ascribed to the applicant, such inclusion would render Claim 14 redundant.

b. financial card term data ratings

Claim 11 also comprises "ratings associated with . . . financial card data," and similar phrases are used in other claims as well. Defendant reasons that the financial card data's rating must be compared to the applicant's rating and so concludes the proper definition for the financial card terms' rating is "a letter grade and numerical score (e.g., A-760) assigned to the terms of each financial card offer that a participating financial institution is willing to make." There must be correlation between the financial card data's rating and the applicant's rating in order to insure the terms are presented only to applicants with the necessary rating – but as with the applicant's rating, the '645 Patent does not proscribe the form or content of the financial card term rating. In light of the Court's rejection of Defendant's rigid definition in the applicant's context, the Court must also reject Defendant's rigid definition in this context.

### D. "Existing Schedule"

The penultimate step in Claim 11 involves "locating financial card offers, said offers including said financial card term data selected by comparing said [applicant] rating with an existing schedule assigned to said financial card term data." As explained in the Preferred Embodiments, "[t]he selection criteria as embodied in each financial institution's selection matrix is reviewed to locate the financial card offers appropriate for the applicant." Col. 6, lines 9-11. This "existing schedule," then, is a form of organizing the financial card terms in a manner that allows the assignment of mandatory or minimum applicant ratings for each particular combination or set of financial card terms. Defendant ascribes more to the phrase because of the Preferred Embodiments' used of the word "matrix." In addition to the sentence quoted earlier in this paragraph, the Preferred Embodiments utilize this word when discussing the Table in Column 4. Defendant points to the use of this word to justify its definition of "existing schedule" as "participating financial institutions' selection criteria organized in a matrix as exemplified and disclosed in col. 4, ll. 20-43 of the specification." Defendant's Markman Brief at 21.

13

The use of the term "matrix" does not suggest any particular form for the chart or other organizing mechanism; in common usage, a matrix only requires an arrangement of numbers bearing a relationship with each other. E.g., The American Heritage Dictionary of the English Language 1110 (3d ed. 1992); Webster's II New Riverside University Dictionary 733 (3d ed. 1994). In this context, the terms "matrix" and "schedule" are synonymous.

The true import of Defendant's suggestion comes from its requirement that the matrix or schedule take the particular form appearing in the Preferred Embodiments set forth on the Table in Column 4. The Preferred Embodiments' declare that the Table is only an example. Col. 4, lines 27-30. Defendant is attempting to the limit the Claims by relying on examples presented in the Preferred Embodiments, but this is not permitted. E.g., In re Omeprazole Patent Litig., 483 F.3d 1364, 1372 (Fed. Cir. 2007); Kraft Foods, Inc. v. International Trading Co., 203 F.3d 1362, 1366 (Fed. Cir. 2000). Nothing in the '645 Patent's Claims requires the matrix or schedule to take any particular form; all that is required is an established relationship between financial card terms and the corresponding and necessary applicant rating.

Defendant also contends the prosecution history supports its definition. On September 23, 2005, the PTO issued its Notice of Intent to Issue Ex Parte Reexamination Certificate indicating, *inter alia*, that certain claims would be allowed. In allowing Claims 11-22 and 26-31, the examiner wrote that he "interprets . . . the term 'existing schedule assigned to the financial card term data' to read participating institution's selection criteria organized in a ma[tr]ix as exemplified and disclosed in col. 4 L 20-43 of the specification." Shortly thereafter, Plaintiff responded by indicating it "agree[d] with the Examiner's statement to the extent the term 'matrix' relates to the general concept of data associations." In March 2006, the PTO issued a Supplemental Notice that contained the exact same language about Claims 11-22 and 26-31. From this sequence of events Defendant concludes the PTO rejected Plaintiff's interpretation as expressed in its October 2005 submission. There are several problems with Defendant's position. First, the Court finds it difficult to conclude the March 2006 Supplemental Notice was intended to reject Plaintiff's interpretation because it does not

14

even reference it. The cover sheet for the Supplemental Notice provides a summary of the action taken, and it also does not mention Plaintiff's October 2005 submission. In fact, the only difference between the Supplemental Notice and the original September 2005 Notice is an indication that the former "[c]orrects a typo in item 1(h)(1) and 1(h)(2) from the [Notice] mailed 9/23/05." The referenced error relates to the identification of Claims approved as written and Claims approved as amended. This sequence of events does not persuade the Court that the Supplemental Notice was intended to address Plaintiff's October 2005 submission. Cf. Phillips v. AWH Corp., 415 F.3d 1303, 1317 (Fed. Cir. 2005), cert. denied, 546 U.S. 1170 (2006) (ambiguity in the prosecution history may render it unhelpful as a resource in aid of claim construction). Regardless, the PTO indicated the Table in Column 4 "exemplified" the matrix it intended to describe – that is, it is an example and not the prescribed form.

Plaintiff's suggested definition – "an association of selection criteria with financial term data" – is closer to the appropriate definition. The Court's only disagreement is with the use of the phrase "selection criteria." The schedule is not merely an association of selection criteria to the financial card's terms, but an association of various applicant ratings to the financial card's terms. This interpretation is gleaned from Claim 11(f), which describes the process for locating an offer (itself consisting of financial card terms) by comparing the applicant's rating to the existing schedule. The existing schedule must associate the financial card terms with the applicant ratings established by the financial institution as necessary to qualify for those terms; otherwise, Claim 11(f) would permit comparing applicant ratings to something else entirely. The Court therefore concludes the proper definition of "existing schedule" is "an association of financial card term data with the applicant ratings established by the financial institution as necessary to become eligible for those particular financial card terms."

*E. "Offer(s)"*

15

The final two steps of the process described in Claim 11 involves "locating financial card offers" and "presenting said financial card offers to" the eligible applicant. The word is used in a similar manner in Claim 22. Defendant contends the word should be defined to mean "proposal of material terms for a financial card that, if accepted, would form a binding contract." Plaintiff proposes the word be defined as "an invitation to accept a financial card." The parties' arguments establish that the point of contention essentially is whether a binding contract is made (1) when the customer clicks on the offer and starts the processing of the application or (2) when the financial institution processes the application and decides to send a financial card to the applicant. The Court holds the latter is the more accurate description and therefore adopts Plaintiff's definition.

Defendant emphasizes the patented process' ultimate objective is to form a contract, and therefore equates "offer" with "offer to form a contract." While Defendant correctly identifies the ultimate objective, it does not necessarily follow that the contract must be formed at the time the applicant selects the offer he or she deems suitable. It is equally plausible for the contract to be formed once the financial institution accepts the application. The presentation of a set of financial card terms to an applicant would constitute an "offer to apply," acceptance of which does not form a binding contract. This view is more consistent with both the extrinsic and intrinsic evidence.

The intrinsic evidence demonstrates the applicant's data is forwarded to the financial institution once an offer is accepted, yet Defendant's definition would obligate the financial institution to issue a card even if the applicant's data is false. This outcome makes no sense. Moreover, as discussed in connection with the definition of "financial card," the process described by the '645 Patent is intended to replace direct mail solicitations. An applicant filling out a direct mail solicitation would not thereby form a binding contract; the application would be reviewed by the financial institution and a card would be issued if that review confirmed the applicant's eligibility. One would expect the replacement process described by this process to follow a similar approach.

Defendant correctly observes there is no real opportunity for the applicant to negotiate with the financial institution, but incorrectly concludes this means acceptance

16

of the offer must result in a binding contract. One has nothing to do with the other, and this narrow view fails to consider the possibility of an offer to apply for a financial card with given terms. This omission is significant given the stated parallels with an offer delivered via direct mail: an applicant filling out the solicitation understands he or she is applying for a credit card, not entering a binding contract obligating the financial institution to issue a card.

In addition to the real world considerations discussed above, the Court notes the '645 Patent describes the person entering data in an attempt to procure a financial card as an "applicant" – that is, someone who is applying for something. An application may be accepted or rejected, so the applicant's efforts are not guaranteed to result in the issuance of a card. The '645 Patent does not describe the person entering data as an "acceptor" or by any other term indicating a contract is formed at the moment the data is submitted.

### *F. Other Terms*

The parties discuss several other terms that appear in Dependent Claims. The Court has already discussed many of these terms while addressing terms in Independent Claims, rendering further discussion redundant. Notably, there is no need for further discussion of the terms "matrix," "financial risk rating," or the means-plus-function claim in Claim 28. There are, however, a few terms that require further discussion.

The parties nearly agree on the definition for "grade and score combination," a phrase used in dependent Claim 15, and the Court finds merit in both parties' objections to the other's proposal. Plaintiff's attempt to describe the phrase as a means "to search financial card term data for financial institution" imports functional language that does not appear in the claim. On the other hand, Defendant's effort to limit the form and content of the "grade and score combination" to the precise form and content offered as

17

an example is also improper.  Therefore, the proper definition of the "grade and score combination" is "a ranking and tally."[5]

The parties' definitions of the phrase "financial application data" are also similar. Claim 28 calls for "financial application data to be processed . . . said financial application data entered by said applicant" as a prelude to determining which financial terms can be offered to the applicant.  Col. 8, lines 53-64.  At their heart, the parties' disagreements arise from differing views as to whether the word "financial" is meant to modify the word "data" or the word "application."  Plaintiff advocates for the latter view, contending the phrase describes any "data" that would be on a "financial application" and encompasses any information one would expect to supply when applying for a financial card.  This information not only includes information about salary, assets, and debts, but also the applicant's name, address, social security number, and other necessary information unrelated to the applicant's financial condition.  In contrast, Defendant focuses on the difference between "personal information" and "financial information" to argue the phrase refers to financial data on the application.  The Preferred Embodiments explain that "a user (applicant) completes an application by providing personal and financial information (application data).  The application data may include the applicant's name, telephone number, home address, e-mail address, income, other assets and liabilities, bank account numbers, etc."  Col. 4, lines 9-14. Thus, application data consists of the combination of personal information and financial information, and financial data must therefore consist of something less than application data.  Without saying so, Defendant essentially equates "financial information" with "financial application data."

The Court concludes Plaintiff has the better argument.  The adjective "financial" should modify the term immediately following it – in this case, that word is "application." Thus, the phrase describes data that would appear on a financial application.  This interpretation is not contradicted by the Preferred Embodiments, primarily because the

---

[5]Frankly, the Court is not sure what this adds to the '645 Patent, but Plaintiff has offered no argument that would justify the addition of functional terms to the phrase.

18

Preferred Embodiments employ a different (albeit similar) phrase.  Moreover, as stated earlier, the Preferred Embodiments cannot be used to limit the scope of the invention's claims.  Finally, in light of the context in which the phrase is used in Claim 28,  it is more logically understood as a reference to the data called for by the financial information as part of this financial transaction.  Interpreting the phrase to mean only some of the information required by this process results in a strained and illogical interpretation that ignores the context in which the phrase is used.
IT IS SO ORDERED.

DATE: September 27, 2007

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT