# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| BLOCK FINANCIAL LLC, (formerly known as "BLOCK FINANCIAL CORPORATION") | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 01-1007-cv-ODS |
| LENDINGTREE, LLC, | ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| LENDINGTREE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 08-cv-164-ODS |
| BLOCK FINANCIAL LLC, (formerly known as "BLOCK FINANCIAL CORPORATION") and DOES 1 through 10, inclusive, | ) ) ) ) | |
| Defendants. | ) | |

## LENDINGTREE, LLC'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

PAGE NO.

I.   Legal Standard .................................................................................3

II.  Argument ........................................................................................5

    A.   Terms Related to the Court's Previous Claim Construction Order .........................6

        1.   "financial card data" / "financial offering data" .................................6

            a)   "financial card data" ........................................................7

            b)   "financial offering data" ....................................................8

        2.   Terms Related to Calculation of a Rating .................................10

        3.   "grading system process" ................................................15

        4.   "financial card" / "electronic financial card" ...........................16

    B.   Additional Proposed Constructions .......................................18

        1.   "using a computer" / "computer user" ....................................19

        2.   "prompting an applicant using a computer" ...............................21

        3.   "credit card offering"....................................................21

        4.   "said applicant's computer"...............................................22

III. Conclusion ...................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Autogiro Co. of America v. United States,*
    384 F.2d 391 (Ct. Cl. 1967) ................................................................................ 4

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,*
    132 F.3d 701 (Fed. Cir. 1997) .......................................................................... 5

*C.R. Bard, Inc. v. United States Surgical Corp.,*
    388 F.3d 858 (Fed. Cir. 2004) ........................................................................ 14

*Digital Biometrics, Inc. v. Identix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998) ...................................................................... 14

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
    849 F.2d 1430 (Fed. Cir. 1988) ........................................................................ 4

*Hoganas AB v. Dresser Indus., Inc.*
    9 F.3d 948 (Fed. Cir. 1993) ........................................................................ 4, 15

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
    175 F.3d 985 (Fed. Cir. 1999) .......................................................................... 4

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996) ........................................ 5

*Microsoft v. Multi-Tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004) ...................................................................... 14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008) ...................................................................... 18

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
    182 F.3d 1298 (Fed. Cir. 1999) ........................................................................ 5

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) .................................................................. 3, 4, 5

*York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.,*
    99 F.3d 1568 (Fed. Cir. 1996) .......................................................................... 3

# LENDINGTREE, LLC'S OPENING CLAIM CONSTRUCTION BRIEF

This memorandum sets forth LendingTree, LLC's ("LendingTree") evidence and arguments in support of its proposed constructions for disputed terms in the asserted claims of U.S. Patent No. 7,310,617 ("the '617 patent"). Declaration of Winslow Taub [hereinafter "Taub Dec."], Exh. 1.[1] The Court previously construed the disputed terms in the claims of U.S. Patent No. 6,014,645 ("the '645 patent"). *See* Taub Dec., Exh. 2 ('645 patent); *id.*, Exh. 3 (Claim Construction Order) [hereinafter "Markman Order"].

The parties have already agreed as to the proper construction of a number of claim terms. These agreed definitions are submitted as an appendix to this brief. Taub Dec., Exh. 4. The remaining disputed terms are listed below.[2]

| Term | Claims |
| --- | --- |
| "financial card data" | 1, 10 and dependents |
| "financial offering data" | 11, 19 and dependents |
| "assigning a rating to said computer user based on said analyzing of said application data" | 1 and dependents |
| "providing a rating for said financial card applicant" | 6 and dependents |
| "rating determined in accordance with said application data concerning said financial card applicant and said data from said third party sources" | 10 and dependents |
| "grading system process" | 13, 14, 21, 22 |
| "financial card" / "electronic financial card" | 1, 6, 10 and dependents |

---

[1] Unless otherwise noted, all cites in this brief are to the '617 patent.

[2] Certain terms present overlapping claim construction questions. This memorandum addresses the related terms in groups.

| "using a computer" | 10, 19 and dependents |
|---|---|
| "computer user" | 1, 2, 6 and dependents |
| "prompting an applicant using a computer" | 19 and dependents |
| "credit card offering" | 18 |
| "said applicant's computer" | 11 and dependents |

For the reasons set forth below, LendingTree's constructions reflect the proper interpretation of the disputed claim language, and should be accepted.

## I.    Legal Standard

A patent infringement analysis requires two steps: proper construction of the asserted claim and a determination of whether the accused method or product infringes the asserted claim as properly construed. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581–82 (Fed. Cir. 1996). In determining the proper construction of a claim, "the court should look first to the intrinsic evidence of record, *i.e.* the patent itself, including the claims, the specification, and if in evidence, the prosecution history." *Id.* at 1582.

The court should begin with the language of the claims themselves, which defines the scope of the protected invention. *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). The significance of claims in defining a patent has been expressed as follows:

> The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which 'particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention.' 35 U.S.C. § 112. It is to these wordings that one must look to determine whether there has been infringement. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them.

3

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)

(quoting *Autogiro Co. of America v. United States*, 384 F.2d 391, 395-96 (Ct. Cl. 1967)).

Claim terms are to be given their ordinary and accustomed meaning. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). There are two instances in which a court may be compelled to give the definition of a term a meaning other than the ordinary and accustomed one. First, a patentee may choose to be his own lexicographer by clearly stating the special definition of the term in the patent specification or file history. *Id.* at 990. The second arises when the terms chosen by the patentee "so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used." *Id.* Ambiguities in a claim should be construed against the patentee because the applicant could have prevented the ambiguities through clearer claim drafting. *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951 (Fed. Cir. 1993).

The court next looks to the patent specification to aid in defining the terms used in the claims. The specification contains a written description of the invention that must be clear and complete enough to enable those of ordinary skill in the art to make and use it. *Vitronics*, 90 F.3d at 1582. Consequently, the specification is "always highly relevant to the claim construction analysis" and "[u]sually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*; *see E.I. du Pont de Nemours & Co.*, 849 F.2d at 1433 (stating that the specification can supply understanding of unclear terms, but should never trump the clear meaning of the claim terms). The court also may consider the prosecution history of the patent, if it is in evidence. *Vitronics*, 90 F.3d at 1582. The prosecution history can and should be used to understand the language in the claim, but it cannot be used to "enlarge, diminish, or vary" the

limitations in the claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).

Intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language" and, ordinarily, is sufficient to resolve any ambiguities and determine the meaning of disputed claim terms. *Vitronics*, 90 F.3d at 1582–83. When the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence for purposes of claim construction. *Id.* at 1583. However, a court may rely on extrinsic evidence— that is, evidence "external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles"—to interpret claims if claim language "remains genuinely ambiguous after consideration of the intrinsic evidence." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 & n.5 (Fed. Cir. 1997) (quotation omitted). Extrinsic evidence may be considered only to assist in the courts understanding of the patent, not to vary or contradict the claim terms. *Markman*, 52 F.3d at 981.[3]

## II.    Argument

The disputed claim terms for the '617 patent can be divided into two groups. First, the parties disagree as to the construction of certain terms that are related to terms previously construed by the Court. Second, there are additional terms not related to the previously construed terms. LendingTree will address each group in turn.

---

[3] Consistent with this limited role for extrinsic evidence, "it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). The use of extrinsic evidence for this "confirming purpose" is particularly appropriate "with respect to technical terms, as opposed to non-technical terms" because the court "must also interpret the technical aspects of the document, and indeed its overall meaning, from the vantage point of one skilled in the art." *Id.*

## A.      Terms Related to the Court's Previous Claim Construction Order

The parties disagree as to the meaning of four sets of terms that were either previously construed by the Court, or are related to terms previously construed by the Court.

### 1.      "financial card data" / "financial offering data"

The parties dispute the proper construction of the claim terms "financial card data" and "financial offering data." The term "financial card data" appears in independent claims 1 and 10. The term "financial offering data" appears in claims 11 and 19. LendingTree proposes that "financial card data" and "financial offering data" should be construed as follows:

| "financial card data" (claims 1 and 10) | "data that relate to a financial card and include terms for the financial card, e.g., type of card, interest rate, fees, APR, credit limit, incentive programs, etc., that are pre-set by the financial institution and presented to consumers for consideration in deciding whether to select the card" |
|---|---|
| "financial offering data" (claims 11 and 19) | "data that relate to a financial offering and include terms for the financial offering, e.g., type of offering, interest rate, fees, APR, credit limit, incentive programs, etc., that are pre-set by the financial institution and presented to consumers for consideration in deciding whether to select the offering" |

LendingTree's proposed constructions incorporate the Court's construction of "terms" in the claims of the '645 patent. As discussed below, "financial card data" and "financial offering data" include financial card terms and financial offering terms, respectively, but are broader in that they may also include data that are not presented to consumers.

The terms "financial card data" and "financial offering data" appear nowhere in the intrinsic record other than in the claims of the '617 patent. They do not appear anywhere in the specification of the '617 patent, or at all in the '645 patent. The applicant did not discuss the meaning of "financial card data" or "financial offering data" during prosecution of either the '645 patent or the '617 patent. Thus the only intrinsic evidence for the meaning of the terms comes from the claims of the '617 patent themselves.

6

### a) "financial card data"

Claims 1 and 10 expressly require that "financial card data" include terms, which the Court has previously determined are data that are "[1] pre-set by the financial institution and [2] presented to consumers." Markman Order at 9.

Claim 1 recites "storing in at least one database financial card data for participating financial institutions, said financial card data ***comprising terms*** for at least one financial card offer from each of said participating financial institutions." 6:52–56 (emphasis supplied). Claim 1 thus expressly states that "financial card data" includes "terms," which per the Court's previous construction are data that are pre-set by the financial institution and presented to customers.

Claim 10 recites "at least one financial card offer for said applicant, located from said database by said server by comparing said financial card applicant rating with said selection criteria for at least one financial card offer of said financial card data provided by said plurality of financial institutions." 8:20–25 (emphasis supplied). Although the wording of claim 10 is different from claim 1, the substance of the quoted claim limitation is the same. The "financial card data" is "provided" (pre-set) "by said plurality of financial institutions." The "financial card offer" is part of the "financial card data." Claim 10 next recites that the "offer," which is part of the "financial card data," is presented to the applicant for review. Thus the "financial card data" recited in claim 10 must include data that is pre-set by a financial institution and presented to customers—the definition of "terms" adopted by the Court for the claims of the '645 patent.

Block proposes that "financial card data" means "information related to a financial card," with no requirement that "financial card data" include <u>any</u> data that is pre-set by financial institutions or presented to the customer. As just discussed, this proposed definition ignores the

limitations of the claims themselves, which require data that "financial card data" include at least some terms, as previously construed by the Court. Thus LendingTree's proposed definition is correct.

### b) "financial offering data"

Although the language of claims 11 and 19 differs from that in claims 1 and 10, it is nonetheless clear based on the claim language that "financial offering data" must also include some <u>terms</u>.

*Claim 11* recites a "first database" containing "financial institution selection criteria and financial offering data for a plurality of participating financial institutions." 8:33–36. The recited system "<u>present[s] to said applicant . . . at least one financial offering located for said applicant according to</u> said application data, said credit history data, and <u>said selection criteria</u> . . ." 8:58–62 (emphasis added). Thus the system stores "financial offering data" for financial institutions and "selection criteria" in a database, and uses the "selection criteria" to locate "offerings" to present to the applicant. The only data related to an "offering" recited in claim 11 is "financial offering data." Thus, in "present[ing]" an "offering" to the applicant, the recited system must present "financial offering data" to that consumer.

Similarly, *claim 19* recites "obtaining financial institution data comprising financial institution selection criteria and financial offering data for participating financial institutions." 9:25–27. The recited method then "<u>select[s] from said financial institution data</u> for participating financial institutions <u>financial offerings in accordance with</u> said financial risk rating and <u>said financial institution selection criteria</u>" and "present[s] to said applicant at said computer for review selected financial offerings." 10:1–8 (emphasis supplied). As with claim 11, the method of claim 19 requires storing "financial offering data" from financial institutions and "selection

8

criteria" in a database, and using the "selection criteria" to locate "offerings" to present to the

applicant.  For the same reasons stated for claim 11, the "financial offering data" must include

data that is presented to the applicant.

Claims 15 and 23 of the '617 patent, which depend from claims 11 and 19, further

underscore the fact that "financial offering data" must include terms that are shown to the

applicant.  Both claims add the requirement that "each financial institution's selection criteria are

organized in a matrix associating financial offering data with a minimum grade/score

combination."  9:9–12; 10:24–27.  The only "matrix" disclosed in the specification is in column

4, and associates financial risk ratings with "Financial Card Term Data":

| Grade | Score | Offer (Financial Card Term Data) |
|---|---|---|
| A | 700 and above | Offer 1 - no annual fee, 8.9% APR for 6 months, afterwards APR goes to 12% fixed, no cash advance fees or minimum finance charges |
| B | 780 and above | Offer 2 - no annual fee, 12.9% APR for 6 months, afterwards APR goes to 15% fixed, no cash advance fees or minimum charges |
| all others | | no offer |

4:36–49.  The data in the right-hand column, in the language of claims 15 and 23 are the

"financial offering data" associated with a "minimum grade/score combination."  The data

include "APR," "fees" and "finance charges" (i.e., interest rates).  Each of these types of data is

expressly listed in the Court's definition of "terms," as data that are pre-set by a financial

institution and presented to a customer as part of an offer.  Markman Order at 9.  Claims 15 and

23 thus underscore that "financial offering data" includes the "term" data that is presented to

customers.

Block's proposed definition of "financial offering data" is "information related to a

financial product," with no requirement that the information be provided by a financial

institution or presented to a customer. As just discussed, Block's proposals ignore the express requirements of claims 11, 19, and their dependents.

Block's proposal also fails to acknowledge that unless "financial offering data" include at least some data that is presented to the customer, the claims do not recite any data that can be "presented" to convey an offering to a customer after that offering has been "selected" or "located." Claims 11 and 19, like every other claim in both Block patents, include "selecting" and "presenting" steps that cannot be performed without data to present to the applicant.

LendingTree's proposed definition, which requires that "financial offering data" include some "term data" that is presented to customers, is therefore correct.

## 2.     Terms Related to Calculation of a Rating

The parties also dispute whether terms in claims 1, 6, 10 and 19 of the '617 patent require that ratings for the applicant be calculated using the applicant's application and / or credit history data. LendingTree proposes that the four disputed terms should be construed as follows:

| | |
|---|---|
| "assigning a rating to said computer user based on said analyzing of said application data" (claim 1) | "calculating a rating for the computer user based on the application data and associating it with the computer user" |
| "providing a rating for said financial card applicant" (claim 6) | "calculating a rating for the applicant and associating it with the applicant" |
| "rating determined in accordance with said application data concerning said financial card applicant and said data from said third party sources" (claim 10) | "rating calculated using the application data and third party data" |
| "assigning a financial risk rating" (claim 19) | "calculating a financial risk rating for the applicant and associating it with the applicant" |

All four of the disputed terms use the term "rating." The Court previously construed "rating," determining that a "rating" is "a value or measure assigned to the applicant." Markman

10

Order at 12–13.[4] The Court declined to consider whether the term "rating," standing alone, is limited to values calculated using application data and / or credit history data.[5]

Regardless of whether a "rating" in general must be calculated, the specific ratings recited in the claims of the '617 patent must be calculated in the manner prescribed by the surrounding claim limitations: using application data, or credit history data, or both. Claim 1 requires the following sequence of steps to "assign" a rating to an applicant:

> (d) receiving at a server said application data from said computer user;
>
> (e) analyzing said application data provided by said computer user;
>
> (f) <u>assigning a rating to said computer user based on said analyzing of said application data;</u>

6:64–7:2 (emphasis supplied). The system must receive data, analyze it, and "assign" the rating based on that analysis. Claim 6 uses similar language to describe the process of "providing a rating":

> obtaining application data for a financial card applicant . . ., said application data for use in providing a rating for said financial card applicant . . .
>
> providing a rating for said financial card applicant, <u>said rating provided in accordance with said application data for said financial card applicant;</u>

---

[4] The claims of the '645 patent recite "ratings" associated with both applicants and financial cards. The four disputed terms in this section all use "rating" as it applies to an applicant.

[5] LendingTree understands that the Court declined to reach the question of whether a "rating" must be calculated because the dispute between the parties at that time was narrower: whether a rating must be a <u>particular type</u> of calculated value: a "grade / score" combination as described in the specification of the Block patents.

7:34–45 (emphasis supplied).  As with claim 1, claim 6 requires that the system receive

application data and, in accordance with that application data, "provid[e]" a rating for the

applicant.  Claim 10 also uses similar language:

> at least one device in communication with said server adapted to
> access data from third party sources;
>
> memory at said server for receiving and storing application data
> concerning said financial card applicant using said computer;
>
> memory at said server for storing a rating for said financial card
> applicant, said rating determined in accordance with said
> application data concerning said financial card applicant and said
> data from said third party sources;

8:9–18 (emphasis supplied).  Claim 10 thus recites using both application data and "data from

third party sources" to "determin[e]" a rating for the applicant.  Claim 19 also uses similar

language:

> prompting an applicant using a computer for application data for
> use in assigning a financial risk rating to said applicant . . .
>
> obtaining from a second database credit history data for said
> applicant in accordance with said application data;
>
> assigning a financial risk rating to said applicant in accordance
> with said credit history data from said second database;

9:31–41 (emphasis supplied).  Claim 19, like claims 1, 6 and 10, separately recites obtaining

application and credit history data, and then, using the application data and credit history data,

assigns a rating to the applicant.

Implicit in Block's construction is the contention that the recited "assigning" /

"providing" / "determining" a "rating" steps can simply use part of the application or credit

history data as the "rating," rather than calculating or deriving the rating from that data.  But in

each of claims 1, 6, 10 and 19, the rating is recited separately and apart from the application and /

or credit history data for the applicant.  If the rating were simply part of the application data or

credit history data, the terms "assigning a rating," "providing a rating," or "determin[ing]" a rating would be surplusage. The claims could simply be drafted to indicate that offerings are located using the application and / or credit history data.

In fact, Claim 11 is drafted in precisely that fashion; it uses the application and credit history data directly to locate an offering, and does not assign, provide or determine a rating at all:

> (a) obtain application data from an applicant using a computer . . .
>
> (c) obtain from said second database credit history data for said applicant . . .
>
> (e) <u>process said application data and said credit history data for said applicant to locate from said first database at least one financial offering for said applicant</u> . . .

8:41–55 (emphasis added). The underlined language provides for locating an offering through direct use of the application and credit history data. Block's proposed construction completely ignores this important difference between claim 11 and the other independent claims of the '617 patent.

LendingTree's proposed constructions are compelled by the plain language of the claims. They are also, however, fully consistent with the remainder of the intrinsic record.

The term "determine a financial risk rating" is used in the Abstract of the patent, and refers to analyzing application and credit history data to calculate a rating: "The applicant provides <u>personal and financial data that are then **_analyzed_** in conjunction with data from outside sources (such as credit bureaus)</u> to determine a financial risk rating for the applicant." Abstract (emphasis supplied); *see also* 5:36–38 (financial risk rating is determined using current data from a credit bureau). The passage in the Abstract is particularly significant for claim construction because the Abstract describes the invention as a whole, and not a particular embodiment. *See*

13

*C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004). The word "determine" is never used in the manner suggested by Block—merely associating a value from the application or credit history data with the applicant.

Likewise, each time the specification uses the terms "assign" or "assigning" a rating, the rating is calculated based on application data and / or credit history data:

> The present invention . . . prompts a user for pertinent information. Additional credit history data may be obtained using the personal and financial information provided by the user. A user may then be assigned a financial risk rating or grade/score **based on the personal, financial and credit history data** provided to the system of the present invention."

2:20–27 (Summary of the Invention) (emphasis supplied). Note that in this passage both application data and credit history data are used to assign the rating, indicating that the rating is not simply taken from one set of data or the other. This passage comes from the Summary of the Invention which, like the Abstract, is particularly relevant for understanding the invention as a whole. *See C.R. Bard*, 388 F.3d at 864; *Digital Biometrics, Inc.*, 149 F.3d at 1347; *Microsoft*, 357 F.3d at 1348.

In the description of the preferred embodiment, where the rating takes the form of a "grade/score,"

> [p]referably, the grading system assigns a grade/score to the applicant by using the application data and other information such as credit bureau data to derive a letter grade and a numerical score (e.g., A-760).

4:25–28; *see generally* 4:50–5:3 (referring to the "grade / score" that was "assigned" to the applicant). Here as well, both application data and "other data", such as credit bureau data, are used to "derive" the rating, indicating that the rating is not simply a value taken from the data.

14

Later in the description of the preferred embodiment, there is another description of assigning a calculated rating to the applicant:

> Using the application data, the applicant's credit history data are located and retrieved for processing 72. Next 74, a grade/score is calculated and assigned to the applicant. The grade/score is calculated using the application data and credit history data obtained directly from the credit bureau in real-time.

6:10–15. The language tracks the language of claim 19 very closely: both the application data and credit history data are "used" in the process of assigning a calculated financial risk rating to the applicant.

In sum, there is <u>no support</u> in the specification for Block's argument that "assigning," "determining," or "providing" a rating refers to simply taking a value from the applicant's application data or credit history data and "associating" it with the applicant. Even if the claim language were ambiguous—which it is not—the fact that the specification only supports LendingTree's construction would compel resolving that ambiguity in LendingTree's favor. *See Hoganas*, 9 F.3d at 951. Thus the Court should adopt LendingTree's proposed constructions.

### 3. "grading system process"

LendingTree proposes that the phrase "grading system process" means "a process of calculating a grade." This definition is supported by the plain meaning of the claim language itself: in order to perform "grading," the system must determine a "grade." This is done through a "process." Thus the system must perform the process of determining, or calculating, a grade.

The specification is fully consistent with this definition. The specification discusses a "grading system process" only in the context of the preferred embodiment, where it is presented as a method of calculating a grade for an applicant to locate financial card offers:

> A "grading system" process 48 may be employed which uses the application data, as well as other data, as input to determine which financial card offers may be presented to the applicant. Preferably,

> the grading system assigns a grade/score to the applicant by using
> the application data and other information such as credit bureau
> data to derive a letter grade and a numerical score (e.g., A-760).

4:22–28. The "grading system process" uses "application data, as well as other data" to "derive"

a grade. The calculated "grade" is then used to "determine which financial card offers may be

presented to the applicant." In the preferred embodiment, the calculated grade is a

"grade/score," which the Court has determined is a "ranking and tally." Markman Order at 18.

LendingTree is unaware of Block's basis for arguing that a "grading system process"

does not mean "a process of calculating a grade." LendingTree will therefore address Block's

arguments in its responsive brief.

### 4.    "financial card" / "electronic financial card"

The final dispute in the first group relates to the meaning of "financial card," which was

previously construed by the Court. Despite the Court's previous common-sense construction of

"financial card," Block is now arguing that a "financial card" need not be made of "plastic or

similar material," but rather can be made of "plastic or [presumably, any] other material." Block

is doing so in an attempt to obtain a construction of "financial card" that covers paper checks, as

well as plastic credit or debit cards.

Block's argument is based, first and foremost, on an incorrect reading of the Court's

claim construction order. At the beginning of the section discussing the meaning of "financial

card," the Court states its construction:

> Plaintiff suggests the proper definition of the phrase is "any
> medium issued to a holder that provides access to financial benefits
> and resources." The Court agrees that Defendant's definition – "a
> tangible piece of plastic or similar material issued by a financial
> institution that authorizes the cardholder to purchase goods and
> services on credit or by debiting a bank account, for example, a
> credit card or debit card" – is more consistent with the intrinsic
> evidence.

16

'645 Markman Order at 4 (emphasis supplied). In the next paragraph, the Court summarizes its rationale for adopting LendingTree's construction:

> Plaintiff's definition utilizes the broader – and more ambiguous – term "medium." This is an attempt to define an ordinary term that is readily understood in a manner that improperly expands the meaning beyond its customary understanding. A "financial card" is not a technical term; it is one understood by ordinary people, <u>and the Court has little difficulty concluding that the ordinary meaning of this phrase refers to a tangible piece of plastic or other material, possession and ownership of which entitles the owner to credit or other sources of money</u>.

*Id.* (emphasis supplied). Block argues that the underlined phrase in the second paragraph, rather than the phrase carefully quoted in the first paragraph, is actually the construction adopted by the Court.

LendingTree believes that Block has misread the Court's order. For every other term discussed in the Markman Order, the Court clearly sets forth its construction in quotes. *See, e.g., id.* at 9 ("financial card terms"), 12 ("rating"), 15 ("existing schedule"). The language Block notes is also different from both parties' proposed constructions. But in the instances where the Court adopts neither party's construction—such as for the definition of "financial card terms"— the Court thoroughly and explicitly sets forth its reasons for doing so. *See id.* at 8–10 ("financial card terms"), 15 ("existing schedule").

To the extent that Block is in fact seeking clarification (or reconsideration) from the Court as to whether checks are "financial cards," the reasoning behind the Court's construction clearly demonstrates that they are not. In particular, the order correctly notes that not all "tangible objects" associated with a loan are financial cards: "These and other examples confirm not only that a financial card is a tangible object, but also that the tangible object is more than a mere talisman confirming a contractual relationship between the customer and the financial institution." *Id.* at 6–7. The Court reviews extensive extrinsic evidence confirming the common

17

sense understanding that a "financial card" is a plastic or similar card, such as a credit or debit card, with well-known characteristics. *See id.* at 6 (describing "the use of an electronic device to obtain information from the card and transmit it to a financial institution to insure verification of the card and approval for the transaction."); *id.* (noting that a prior art patent "discusses use of an electronic reader that transfers data to and from the magnetic strip on the card."); *id.* at n.2 (noting "[a] non-exhaustive list of additional prior art using the term 'financial card' in the same or similar manner [that] includes Patent Numbers 5,530,232, 5,884,289, 5,608,203 and 5,650,604.").

Nowhere in this extensive discussion of the meaning of "financial card" is there any suggestion that a check is a type of financial card. The features noted by the Court—the ability to interface with an electronic device, the use of magnetic strips—are not present in paper checks. Block's argument that a check is a "financial card" is contrary to common sense and the Court's claim construction order, and should be rejected.

**B.    Additional Proposed Constructions**

LendingTree proposes constructions for an additional set of terms not addressed in the Court's previous order. With respect to certain of these terms, Block has refused to propose constructions, and instead states that the claim terms should be given their "plain meaning." As the Federal Circuit has recently held, appealing to "plain meaning" arguments for disputed claim terms is an improper end-run around the Court's obligation to interpret the claim language as a matter of law. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008). Without guidance from the Court, Block may seek to make arguments to the jury about how certain claim language should be interpreted. Thus LendingTree's proposed constructions should be adopted.

### 1. "using a computer" / "computer user"

Four of the construction disputes turn on a single issue: the meaning of "using a computer" or "computer user" in the following terms:

- "applicant using a computer" (claims 11, 19)

- "computer user" (claim 1)

- "financial card applicant using a computer" (claim 10)

- "public network computer users" (claim 6)

LendingTree proposes that the term "using a computer" means "providing information to or receiving information from a computer." LendingTree further proposes that the phrase "computer user" means "a person providing information to or receiving information from a computer." Block does not offer any alternate proposal. LendingTree is presently unaware of Block's basis for disagreeing with LendingTree's proposed constructions, and will address any such disagreement in its responsive brief. For purposes of this brief, LendingTree will focus on why its construction is correct.

The claims support LendingTree's proposed construction because they encompass two ways in which an individual may "use" a computer: providing information, and receiving information.

- Claim 11 recites that the system "obtain[s] application data from an applicant using a computer," (the applicant provides information) and then later "present[s] to said applicant for review at said applicant's computer at least one financial offering . . ." (the applicant receives information). 8:41–59.

- Claim 19 recites that the system "prompt[s] an applicant using a computer for application data" (the applicant provides information) and then later "present[s] to said applicant at said

computer for review selected financial offerings" (the applicant receives information). 9:31–10:7.

- Claim 1 recites that the system "prompt[s] a computer user for application data" and "present[s] to said computer user for review said financial card offers . . ." 6:61–7:8.

- Claim 6 recites that the "public network computer users" access the site, which "obtain[s] application data for a financial card applicant accessing said site" and "present[s] to said financial card applicant for review offers located for said applicant . . ." 7:24–52.

- In claim 10, the system "receiv[es] and stor[es] application data concerning said financial card applicant using said computer," and "present[s] to said applicant for review said financial card offer . . ." 8:11–27.

The specification also supports LendingTree's proposed construction because it emphasizes that the particular mechanism by which the applicant interacts with the system is unimportant: "Because the Card Service is based on Internet/WWW technology, it may be accessed through a number of interfaces—for example, native Microsoft® Windows™ applications or hyper-text mark-up language (HTML)/Web browsers." 3:2–6. "Multiple user interfaces to the Card Service are implemented as different types of clients." 3:12–13. Thus the particular way in which a user interacts with the system is not critical; what matters is that the applicant can provide information to or receive information from the system.

In sum, LendingTree's proposed definition captures the essential role of a "computer user" or "applicant using a computer" in the asserted claims: "providing information to or receiving information from a computer."

## 2. "prompting an applicant using a computer"

LendingTree proposes that the term "prompting an applicant using a computer" be construed to mean "displaying questions to an applicant on a computer display." Block does not propose a construction for this term.

The word "prompt" is consistently used in the claims to describe the step of collecting information from the applicant. For example, claim 19 requires "prompting an applicant using a computer <u>for application data</u> . . ." 9:31–32 (emphasis supplied). Dependent claim 20 adds to this step the requirement of "prompting the applicant for the applicant's name, telephone number, home address, e-mail address, income, other assets and liabilities, and bank account numbers"—i.e., asking the applicant questions to collect specific pieces of application information. 10:10–13.

As Block does not offer an alternate construction, LendingTree will address Block's arguments in its responsive brief.

## 3. "credit card offering"

LendingTree proposes that the term "credit card offering" be construed to mean "credit card."

Claim 18 is the only place in the entire intrinsic record that the phrase "credit card offering" appears. Claim 18 recites "The system of claim 11 wherein said at least one financial offering is a credit card offering." 9:21–22. The "at least one financial offering" in claim 11 is the offering that is "present[ed] to said applicant for review." 8:58–59.

The only passage in the specification using the word "offering" is as follows: "The present invention recognizes the limitations of using direct mailings for matching financial institutions and their card offerings with new customers." 2:14–16. The phrase "card offerings"

in this passage, which occurs at the beginning of the "Summary of the Invention," appears to refer back to a passage in the "Background of the Invention": "Financial institutions interested in locating new customers for their financial cards (such as credit cards, debit cards, etc.) often rely on direct mailings." 1:20–22. Thus "card offerings" are "financial cards (such as credit cards, debit cards, etc.)." By extension, "credit card offerings" are "credit cards."

Block's proposed definition, "a financial offering that includes a credit card," introduces the vague word "includes," which appears nowhere in the specification and raises more questions than it answers. What does it mean for a product to "include" a credit card? Must the credit card be presented to the customer? In contrast, LendingTree's definition of a "credit card offering" as a "credit card" comports with the intrinsic evidence and is clear.

### 4. "said applicant's computer"

The term "said applicant's computer" is used only in claim 11 of the '617 patent. LendingTree proposes that the term be construed to mean "the computer used by the applicant." This definition is supported by the language of the remainder of claim 11:

> (a) obtain application data from an applicant using a computer connected to one of said servers using said public network . . .
>
> (f) present to said applicant for review at said applicant's computer at least one financial offering located for said applicant according to said application data, said credit history data, and said selection criteria for at least one of said plurality of participating financial institutions.

8:41–63. The term "said applicant's computer" in element (f) refers back to the term "a computer" in element (a). Element (a) requires that the applicant be "using" the computer. Thus "said applicant's computer" means "the computer used by the applicant."

As Block has not provided an alternative construction, LendingTree will address any of Block's arguments in its responsive brief.

## III.    Conclusion

For the foregoing reasons, LendingTree asks the Court to enter an order adopting

LendingTree's proposed constructions for the disputed claim terms of the '617 patent.


Respectfully submitted,

Dated:  October 30, 2008          /s/ Robert D. Fram

Robert D. Fram (Admitted Pro Hac Vice)
Winslow B. Taub (Admitted Pro Hac Vice)
Leslie N. Harvey (Admitted Pro Hac Vice)
**COVINGTON & BURLING LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 591-6000 / Fax: (415) 591-6091
rfram@cov.com
wtaub@cov.com
lharvey@cov.com


Edward R. Spalty (Missouri Bar No. 26086)
David A. Jermann (Missouri Bar No. 51389)
ARMSTRONG TEASDALE LLP
2345 Grand Boulevard, Suite 2000
Kansas City, Missouri 64108-2617
Tel: (800) 243-5070 / Fax: (816) 329-5426
espalty@armstrongteasdale.com
djermann@armstrongteasdale.com


ATTORNEYS FOR LENDINGTREE, LLC

23

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of LENDINGTREE, LLC'S OPENING CLAIM CONSTRUCTION BRIEF was electronically filed with the Clerk of Court on this 30th day of October, 2008 using the CM/ECF system, which sent notification of such filing to the following:

Jeffrey S. Standley
F. Michael Speed, Jr.
Mark R. Engle
STANDLEY LAW GROUP LLP
495 Metro Place South, Suite 210
Dublin, OH 43017-5319
Tel.: 614-792-5555
Fax: 614-792-5536
jstandley@standleyllp.com
mspeed@standleyllp.com
mengle@standleyllp.com


Mark W. Brennan
BRYAN CAVE LLP
3500 One Kansas City Place
1200 Main Street, Suite 3500
Kansas City, MO 64015-2100
Tel.: 816-374-3200
Fax: 816-374-3300
mwbrennan@bryancave.com



                                  /s/ Robert D. Fram

                                ATTORNEY FOR LENDINGTREE, LLC