**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| BLOCK FINANCIAL LLC, (formerly known as "BLOCK FINANCIAL CORPORATION") | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 01-1007-cv-ODS |
| LENDINGTREE, LLC, | ) ) | |
| Defendant. | ) ) | |

_____)_____

| | | |
|---|---|---|
| LENDINGTREE, LLC, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 08-cv-164-ODS |
| BLOCK FINANCIAL LLC, (formerly known as "BLOCK FINANCIAL CORPORATION") and DOES 1 through 10, inclusive, | ) ) ) ) | |
| Defendants. | ) ) | |

**LENDINGTREE, LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.     "financial offering data" and "financial card data".............................................................. 1

    A.     The Claim Language Compels the Conclusion that "financial offering data" Are Presented to a Consumer ........................................................ 1

    B.     The Specification Supports the Conclusion that Financial Offering Data Are Presented to a Consumer........................................................................ 5

    C.     Block Distinguished Its Purported Invention from the Prior Art on the Grounds That Each Independent Claim Requires Storing "terms" for Financial Offerings in a Database .......................................................... 6

    D.     Block's Construction Erroneously Relies on a Broad Definition of "data" While Ignoring the Surrounding Claim Language and the Intrinsic Evidence.................................................................................................... 8

    E.     LendingTree's Construction Is Consistent with Specific Differences in the Claim Language and Does Not Render Any Such Language Superfluous .......... 10

    F.     "financial card data" Is Also Presented to a Consumer ....................................... 11

II.    "financial card" ...................................................................................................... 11

    A.     The Court's Claim Construction Order Does Not Support Block's Far-Fetched Theory that "financial card[s]" Include "Checks" .................................. 11

    B.     The Extrinsic Evidence Cited by Block Does Not Support Its Contention that a Card Is a Check or a Check Is a Card ...................................................... 13

III.   Terms Related to the Derivation of a Rating ................................................... 14

    A.     The Claim Language—Taken As a Whole—Supports LendingTree's Construction........................................................................................................ 15

    B.     LendingTree's Construction Is Consistent with the Court's Prior Claim Construction Order................................................................................................ 16

IV.    "grading system process"........................................................................................ 18

V.     "using a computer" / "computer user" .................................................................... 19

VI.    "prompting an applicant using a computer" ..................................................... 20

VII.   "credit card offering" ............................................................................................. 20

VIII.   "said applicant's computer" ................................................................ 21

IX.   Conclusion ............................................................................................ 21

X.   Oral Argument ...................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

CASES

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
  287 F.3d 1108 (Fed. Cir. 2002)...................................................................................9

*Kopykake Enters., Inc. v. Lucks Co.*,
  264 F.3d 1377 (Fed. Cir. 2001)................................................................................14

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004)..................................................................................20

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (en banc)...................................................................14

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
  287 F.3d 1062 (Fed. Cir. 2002)................................................................................14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)................................................................................21

*Panduit Corp. v. Dennison Mfg. Co.*,
  810 F.2d 1561 (Fed. Cir. 1987)................................................................................10

*PC Connector Solutions LLC v. SmartDisk Corp.*,
  406 F.3d 1359 (Fed. Cir. 2005)..........................................................................14, 16

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)...............................................................10

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995)...................................................................................9

*SRI Int'l v. Matsushita Elec. Corp.*,
  775 F.2d 1107 (Fed. Cir. 1985) (en banc)...............................................................14

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
  239 F.3d 1225 (Fed. Cir. 2001)................................................................................20

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006)................................................................................14

LendingTree, LLC ("LendingTree") responds to Block Financial LLC's Opening Claim Construction Brief as follows.

## I.    "financial offering data" and "financial card data"

The parties have met and conferred further regarding their proposed constructions and have narrowed the dispute to a single issue:  whether "financial offering data" must include <u>some</u> data that are presented to consumers.  Neither party contends that the data must be pre-set by financial institutions.  Accordingly, LendingTree's revised proposed constructions are as follows:

| "financial card data" (claims 1 and 10) | "data that relate to a financial card and include data for the financial card, e.g., type of card, interest rate, fees, APR, credit limit, incentive programs, etc., that are presented to consumers for consideration in deciding whether to select the card" |
| --- | --- |
| "financial offering data" (claims 11 and 19) | "data that relate to a financial offering and include data for the financial offering, e.g., type of offering, interest rate, fees, APR, credit limit, incentive programs, etc., that are presented to consumers for consideration in deciding whether to select the offering" |

Block is incorrect in asserting that "financial card data" and "financial offering data" need not contain <u>any</u> data that are presented to consumers.

### A.    The Claim Language Compels the Conclusion that "financial offering data" Are Presented to a Consumer

The recited "financial offering data" must include some data that are presented to a consumer.  The language of the claims compels this conclusion for three reasons.

First, it bears emphasis that the recited data are "financial offering" data, and both claims 11 and 19 require that the "offering" be "present[ed]" to the applicant.  8:58–59 (claim

11); 10:7–8 (claim 19).[1]  Moreover, the preamble of claim 19 expressly states that the claim constitutes "[a] computerized method for <u>presenting</u> electronic financial offerings."  9:23–24 (emphasis supplied).  Thus the data for the financial offering—the "financial offering data"— must at least include the data that is presented to the applicant.

Second, both claims recite that the system stores two kinds of financial information (as part of "financial institution data"):  (a) financial institution selection criteria and (b) financial offering data.  Once the selection criteria are applied and an offering is selected, it is then presented to the consumer.  The claim language therefore teaches that what is presented to the consumer—after the selection criteria have been applied—is the second type of financial information—the "financial offering data."  No other purpose for storing such data is disclosed nor would there be any logic in keeping it concealed from the customer.  In particular:

- In both claims, the "financial offering data" is stored in a "first database," along with "selection criteria."  Claim 11 requires "a first database for storing financial institution data comprising <u>financial institution selection criteria and financial offering data</u>."  8:33–36 (emphasis supplied).  Claim 19 requires "obtaining financial institution data comprising <u>financial institution selection criteria and financial offering data</u> for participating financial institutions, wherein said financial institution selection criteria comprises financial risk ratings associated with financial offerings," and "storing said financial institution data <u>in a first database</u>."  9:25–30 (emphasis supplied).

---

[1]  Unless otherwise noted, all cites in this brief are to U.S. Patent No. 7,310,617 ("the '617 patent").  The '617 patent is attached as Exhibit 1 to the October 30, 2008 Declaration of Winslow B. Taub in Support of LendingTree, LLC's Opening Claim Construction Brief ("10/30/2008 Taub Dec.").

- Both claims then use the selection criteria to "select" or "locate . . . offering[s]" that are associated with the selection criteria in the first database. Claim 11 requires "locat[ing] from said first database at least one financial offering . . . said at least one financial offering meeting selection criteria for at least one of said plurality of participating financial institutions." 8:53–57. Claim 19 requires "selecting from said financial institution data [stored in said first database] . . . financial offerings in accordance with said financial risk rating and said financial institution selection criteria for participating financial institutions." 10:1–5.

- As already discussed, both claims then recite (in their last element) "presenting" the offerings to the applicant. 8:58–59 (claim 11); 10:7–8 (claim 19).

Third, the term "financial offering data" in the '617 patent plays the same role as "financial card term data" in U.S. Patent No. 6,014,645 ("the '645 patent").[2] And in the context of the '645 patent the Court has determined that "terms"; *i.e.*, "financial card term data," are presented to the customer.[3] Thus, a side-by-side comparison of claim 11 of the '645 patent with claim 19 of the '617 patent demonstrates the point that "financial offering data" must be presented to the consumer (emphasis supplied in all cases):

---

[2] While the claims of the '617 and '645 patent are structurally identical on this point, there are several instances where they diverge. The '645 patent is attached as Exhibit 2 to the 10/30/2008 Taub Declaration.

[3] LendingTree understands "financial card terms" and "financial card term data" to be used interchangeably in the shared specification of the '645 and '617 patents. LendingTree further believes that the Court shares this understanding, as the Court cited passages describing both "financial card terms" and "financial card term data" in construing the word "terms" in the claims of the '645 patent. *See* Markman Order (10/30/2008 Taub Dec., Exh. 3) at 9 (quoting passages describing "financial card term data" in support of the construction of "terms"); *see also* '617 Patent at 5:22–27 (defining "financial card term data" as "the terms of the financial card offers").

Case 4:01-cv-01007-ODS   Document 114   Filed 12/05/08   Page 7 of 28

| Claim 11 of the '645 Patent | Claim 19 of the '617 Patent |
| --- | --- |
| An electronic method for applying for a <u>financial card</u>, comprising the steps of | A computerized method for presenting electronic <u>financial offerings</u> comprising: |
| (a) storing financial institution data for participating financial institutions; | obtaining financial institution data comprising financial institution selection criteria |
| (b) storing <u>financial card term data</u> for each of said participating financial institutions; | and <u>financial offering data</u> for participating financial institutions, |
| (c) providing ratings associated with said financial card term data; | wherein said financial institution selection criteria comprises financial risk ratings associated with financial offerings;<br><br>storing said financial institution data in a first database; |
| (d) prompting an applicant for application data; | prompting an applicant using a computer for application data for use in assigning a financial risk rating to said applicant to locate financial offerings for said applicant;<br><br>receiving at a server from said applicant computer said application data;<br><br>obtaining from a second database credit history data for said applicant in accordance with said application data; |
| (e) assigning a rating to said applicant; | assigning a financial risk rating to said applicant in accordance with said credit history data from said second database; |
| (f) locating <u>financial card offers, said offers including said financial card term data</u> selected by comparing said rating with an existing schedule assigned to said financial card term data; and | selecting from said financial institution data for participating financial institutions <u>financial offerings</u> in accordance with said financial risk rating and said financial institution selection criteria for participating financial institutions; and |
| (g) <u>presenting said financial card offers to said applicant</u>. | <u>presenting to said applicant at said computer for review selected financial offerings</u>. |

The highlighted elements reflect the same essential steps in both claims: obtain offering data and

selection criteria associated with each offering, use the selection criteria to locate offerings

matching a consumer's qualifications, and present those matching offers to the consumer. In both claims, it is the data associated with the selection criteria—either "financial card term data" or "financial offering data"—that are presented to the consumer.

**B.    The Specification Supports the Conclusion that Financial Offering Data Are Presented to a Consumer**

The phrase "financial offering data" does not appear anywhere in the specification or file history for the '617 patent. However, to the extent that the specification discusses "data" related to a financial card (the only financial product disclosed in the specification) the discussion further supports LendingTree's construction. It does so in two ways.

First, the specification describes "financial card term data." 4:36–49. When it does so, it teaches that such data comprises APR, annual fee information, cash advance fees, and finance charges. 4:36–49. This is the type of data that is presented to a customer.

Second, the specification describes "financial card terms" (1:38) and teaches that such terms include "credit limit, interest rate, yearly fee, etc." 1:25–28. Consistent with these passages in the specification, the Court construed "financial card terms" (and, thus, "financial card term data") to be data that is pre-set by a financial institution and is presented to a consumer for review.

The other references to "data" in the specification do not concern a financial product. Thus:

- Customer application "data." *See, e.g.*, Abstract ("[t]he applicant provides personal and financial data"). This data is not "financial offering data" because it relates to the applicant, and not to a financial product.

5

- Credit history data. *See, e.g.*, Fig. 4. This data is also not "financial offering data" because it relates to the applicant, and not to a financial product.

- Financial institution "data" that is not related to a financial card. *See, e.g.*, 5:14–21. The specification discusses "financial institution data" that is related to transacting business with the institution generally, and not to a specific financial card product. "In the first step 60, participating financial institutions provide contact and other information that may be needed to complete a transaction using the present invention (participating financial institution data.)" 5:18–21.

It is important to note that while the specification does discuss "financial institution data" that is not related to the terms of a financial product, in the <u>claims</u> of the '617 patent the only "financial institution data" that is discussed (aside from the selection criteria) is the "financial offering data"—*i.e.*, data which does relate to the terms of the financial product.

In sum, there is nothing in the intrinsic record to support Block's contention that "financial offering data" is simply information related to a financial offering, with no requirement that it include the terms of the "offerings" that are presented to the applicant.

C. **Block Distinguished Its Purported Invention from the Prior Art on the Grounds That Each Independent Claim Requires Storing "terms" for Financial Offerings in a Database**

Block's proposed construction is also untenable because it obtained the '617 patent by arguing to the Patent and Trademark Office that each independent claim requires a database that stores "terms"—which the Court has previously construed are presented to a consumer. During prosecution of the '617 patent, the examiner rejected all claims over Norris,

6

U.S. Patent No. 6,105,007, in combination with one or more other references.[4]  The examiner

argued that a database called "REF 60" in Norris stored "financial card data" and "financial

offering data," as required by the claims of the '617 patent.  May 18, 2006 Office Action (Taub

Dec., Exh. 1) at 3 (finding that Norris discloses "financial card data" as required by claim 1), 11–

13 (adopting the analysis from claim 1 for the "financial offering data" element of claim 10).[5]

Block distinguished Norris on the grounds that it does not disclose storing "terms"

in the "REF 60" database.  Block first argued that Norris does not disclose storing "financial card

data," as "recited in claim 1 and similar elements in other claims":

> "Norris fails to teach at least '<u>storing in at least one database</u>
> <u>financial card data</u> for participating financial institutions, said
> financial card data comprising at least one financial card offer from
> each of said participating financial institutions' <u>as recited in claim</u>
> <u>1 and similar elements in other claims</u>."

August 18, 2006 Response to Office Action (Taub Dec., Exh. 2) at 12 (emphasis supplied).  Note

that Block made this argument with respect to <u>all</u> claims in the pending application ("claim 1 and

similar elements in other claims"), including claims 11 and 19, which recite "financial offering

data" rather than "financial card data."  Block then stated that "the REF 60 database <u>does not</u>

<u>comprise 'financial card term data'</u> and Norris does not support the rejections."  *Id.* at 13

(emphasis supplied).  Thus Block distinguished <u>all pending claims</u>, including the "financial

offering data" claims, on the grounds that the prior art does not disclose a database containing

"terms."

---

[4] A true and correct copy of the complete file history for the '617 patent was submitted as
Exhibit 5 to the 10/30/2008 Taub Declaration.  For the Court's convenience, excerpts from the
file history specifically cited in this brief are attached to the accompanying Declaration of
Winslow B. Taub in Support of LendingTree, LLC's Responsive Claim Construction Brief
("Taub Dec.").

[5] Claim 10 was later renumbered, and issued as claim 11 of the '617 patent.

Block cannot now reclaim what it gave up during prosecution. "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1115 (Fed. Cir. 2002). In *Fantasy Sports Properties*, the patent claimed a "fantasy sports" system that made use of "bonus points" for unusual plays, such as a fumble being recovered for a touchdown. *Id.* During prosecution, the applicant distinguished a prior art article that described awarding points for achievements other than scoring plays, such as "total yardage." *Id.* at 1114. The Federal Circuit held, based on the applicant's argument, that "bonus points" was limited to bonus points for <u>scoring plays</u>, because the applicant "disclaimed any interpretation of the term 'bonus points' that encompasses scoring methods described in the 1987 article, including distance scoring and total yardage." *Id.* at 1115.

Here, similarly, Block distinguished prior art systems that lack a database containing "terms." Block cannot now argue that its claims encompass a first database that contains no "terms." Only two types of data are recited as being in the "first database" in claims 11 and 19: "selection criteria" and "financial offering data." The "selection criteria" are not terms presented to the consumer—they are the data used to locate offerings. Thus the recited "financial offering data" must contain the terms that are presented to the consumer.

**D.      Block's Construction Erroneously Relies on a Broad Definition of "data" While Ignoring the Surrounding Claim Language and the Intrinsic Evidence**

Block's proposed construction of "financial offering data" is based on a broad definition of "data," which Block purports to find in the specification. Block misconstrues the

specification. Block's argument is also flawed because it employs a mode of claim analysis that has been rejected by the Federal Circuit.

Block alleges that the specification defines "data" as "information," but the two passages cited by Block do not support that broad definition. As an initial matter, the passages cited by Block do not define "data" in general but rather concern the term "application data." *See* 2:62–65, 4:14–16. Moreover, even in that context, the patent does not define "application data" as being synonymous with "information" but rather defines it as "personal and financial information. *See* 4:14–16 (defining "application data" as "personal and financial information"); 2:62–65 ("[o]nce connected to the site, users interact with HyperText Markup Language (HTML) documents to provide application data (personal and financial information) and to review . . ."). Block italicizes the term "information" in these passages to suggest that data is broadly defined by the patent to merely be "information" of any kind. Read in context, it is clear that the patent uses the term data (and information) to refer to specific types of data (or information)—whether "application data" (in the case of the passages cited by Block) or "financial offering data."

Moreover, even if Block could find some support for the proposition that the word "data," standing alone, means "information," the Federal Circuit has soundly rejected approaching claim construction through abstract definitions of individual words, read out of the context of the claims and specification. "In patent law, a word ('teeth'; 'hinge'; 'ledge') means nothing outside the claim and the description in the specification." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1576 (Fed. Cir. 1987); *cf. Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc) ("The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of

claim terms within the context of the patent. Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan <u>after reading the entire patent</u>." (emphasis added)). Here, based on how the patentee has used the phrase "financial offering data" in the claims—the only place the phrase appears in the entire intrinsic record—the recited "financial offering data" must at least include the data that is presented as an "offering" to the applicant.

**E.** **LendingTree's Construction Is Consistent with Specific Differences in the Claim Language and Does Not Render Any Such Language Superfluous**

Finally, contrary to Block's suggestion, LendingTree's proposed construction properly takes into consideration differences in claim language, and does not render any claim language superfluous. LendingTree's proposed construction for "financial offering data" is different from the Court's construction of "term data" in that "financial offering data" <u>may</u> include other data besides term data. The fact that "financial offering data" must contain some "term data" does not mean that "financial offering data" and "term data" are one and the same.

The additional language related to "terms" in claim 1 is also perfectly consistent with LendingTree's proposed construction because it imparts additional meaningful limitations, such as the requirement that the database contain terms "for at least one financial card offer from <u>each of said participating financial institutions</u>." 6:52–56 (emphasis supplied). This language adds the significant requirement that the "financial card data" contain terms for <u>each</u> institution, and is not surplusage even if "financial card data" must, as LendingTree proposes, contain <u>some</u> term data for <u>some</u> financial institution. Thus LendingTree's proposed construction is fully consistent with the rest of claim 1.

### F. "financial card data" Is Also Presented to a Consumer

Similar to claims 11 and 19, claims 1 and 10 recite "financial <u>card</u> data" (*cf.* "financial offering data" in claims 11 and 19) associated with "selection criteria." The "selection criteria" are used to locate "financial card offers" to present to the applicant. For all of the reasons stated above in connection with "financial offering data," the "financial card data" must include data presented to a consumer.

In addition, as set forth in LendingTree's opening brief, claims 1 and 10 expressly require that the "financial card data" include data that is presented to the applicant. Claim 1 recites that the "financial card data" includes "terms . . . from each of said participating financial institutions." 6:52–56. The Court has already construed "terms" as data that are presented to a consumer. Claim 10 recites that the "offer" presented to the applicant is "of" (*i.e.*, taken from) "said financial card data provided by said plurality of financial institutions." *See* 8:23–25. Thus the phrase "financial card data" in claims 1 and 10 must include data that is presented to a consumer.

## II. "financial card"

Block's proposal that a check is a "financial card" violates common sense and the law of the case, as established by the Court's claim construction order for the '645 patent.

### A. The Court's Claim Construction Order Does Not Support Block's Far-Fetched Theory that "financial card[s]" Include "Checks"

In support of its position that a check could be a "financial card," Block cites to the Court's previous claim construction order, arguing that a financial card need not be made of plastic but rather was construed by the Court to be "a tangible piece of plastic <u>or similar material</u> issued by a financial institution that authorizes the cardholder to purchase goods and services on

credit or by debiting a bank account, for example, a credit card or debit card."  Markman Order at 4 (emphasis supplied).

Block takes the Court's reference to "similar material" as permission to expand the definition of a "financial card" beyond recognition—and to be so broad as to include a check. Thus Block would define the term to include "a tangible piece of plastic or <u>other</u> material, possession and ownership of which entitles the owner to credit or other sources of money."[6]  *Id.* (emphasis supplied).

Block's expansion of the Court's construction[7] suffers from a simple flaw:  it has read the requirement of a "card" out of the definition.  The Court's construction plainly referred to an item "issued by a financial institution."  In plain English, a card.  That the card might be made of something other than plastic does not give Block license to transform a check into a card or a card into a check.

Block employs the same appeal to abstraction that the Court rejected in construing the term "financial card" in the claims of the '645 patent.  The Markman Order states that Block's proposed abstract construction "attempt[s] to define an ordinary term that is readily understood in a manner that improperly expands the meaning beyond its customary understanding."  *Id.* at 4.  The Order later states that the meaning of "financial card" "is not limitless or malleable"; rather, the meaning of "financial card" is "*already* limited in light of the meaning it already has."  *Id.* at 7.  Indeed, the very passage cited by Block in support of its

---

[6] For all of the reasons set forth in LendingTree's opening brief, Block's argument that this phrase is in fact the construction adopted by the Court is incorrect.

[7] Block's proposed new construction amounts to an unsupported request for reconsideration of a term that has already been construed.  While baseless on the merits, it is therefore also procedurally improper.

argument undercuts it: "not all acquisitions of credit (or other accesses to money) are described; only those that can be accessed via the use of a 'financial card' are described." Markman Order at 5 (emphasis added).

**B.** **The Extrinsic Evidence Cited by Block Does Not Support Its Contention that a Card Is a Check or a Check Is a Card**

In addition, regardless of whether Block is correct that a financial card may be made of "plastic or other material," Block presents no evidence or arguments demonstrating that a check is a "financial card" under any common sense understanding of that term.

First, Block's citations to materials allegedly showing "current and historical practices in the credit industry"—the subject of LendingTree's co-pending motion to strike—are immaterial as a matter of law, as they all date from long after the April 19, 1996, filing date for the application that led to the '617 patent which is the relevant date for claim construction. "We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); *see also PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995) (en banc)); *Kopykake Enters., Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001). Block's citation of LendingTree's current website is particularly egregious given the long-standing rule that claims are <u>not</u> to be construed in light of the accused product. "It is well settled that claims may not be construed by reference to the accused device." *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) (citing *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en

banc)); *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006) ("a court may not use the accused product or process as a form of extrinsic evidence to supply limitations for patent claim language.").

But even if they were admissible and relevant, the cited materials further reinforce LendingTree's point: all of the cited references describe checks and financial cards as distinct. *See* Engle Declaration, Exhibit C ("Paper <u>or</u> Plastic, <u>two ways</u> to access your account"); Exhibit D (separately reciting a "credit card" and "access checks"); Exhibit E (describing "checks <u>or</u> a credit card") (emphasis supplied in all cases). Not a single reference cited by Block refers to a check as a "card."

\*    \*    \*

As stated in LendingTree's opening brief, a check has none of the common sense features of "financial cards" reviewed by the Court in the previous Markman order, such as magnetic strips or the capability of being used with an electronic reader. *See* Markman Order at 6. Not a single piece of intrinsic or extrinsic evidence cited by Block refers to a check as being a "financial card." The Court should therefore hold that a check is not a "financial card" within the meaning of the claims of the '617 patent.

## III.    Terms Related to the Derivation of a Rating

The parties have met and conferred further regarding the four terms in claims 1, 6, 10 and 19 related to "assigning," "providing" or "determin[ing]" a rating. The dispute, as clarified, is as follows: LendingTree asserts that the ratings recited in claims 1, 6, 10 and 19 must be derived from, but separate from, the "application data," "credit history data," and / or "third party data" recited in those claims. LendingTree does <u>not</u> contend that there is a particular calculation used to derive the rating, or that certain application or credit history data must be

used to derive the recited ratings.  Thus LendingTree's clarified proposed constructions are as follows:

| | |
|---|---|
| "assigning a rating to said computer user based on said analyzing of said application data" (claim 1) | "deriving a rating for the computer user based on the application data and associating it with the computer user" |
| "providing a rating for said financial card applicant" (claim 6) | "deriving a rating for the applicant and associating it with the applicant" |
| "rating determined in accordance with said application data concerning said financial card applicant and said data from said third party sources" (claim 10) | "rating derived using the application data and third party data" |
| "assigning a financial risk rating" (claim 19) | "deriving a financial risk rating for the applicant and associating it with the applicant" |

Block contends that the "rating" may simply be a value taken from the other recited data. Block's position is contrary to the claim language and the entirety of the intrinsic record, and should be rejected.

### A.     The Claim Language—Taken As a Whole—Supports LendingTree's Construction

Block's proffered constructions for the disputed terms related to the derivation of a rating fail to consider the context surrounding those terms in the claims.  Each of claims 1, 6, 10 and 19 of the '617 patent requires a "rating," separate from "application data" and "credit history data," and further requires that the "rating" be assigned, provided or determined using application data, or credit history data, or both.  LendingTree's opening claim construction brief reviews the requirements of each claim in detail.[8]

---

[8] LendingTree also notes that the dictionary definition cited in Block's opening brief, also addressed in LendingTree's co-pending motion to strike—is irrelevant because it post-dates the (continued…)

Block's proposed construction ignores these additional limitations, and further ignores the clear distinction between claims 1, 6, 10 and 19, on the one hand, and claim 11 on the other. Claim 11 does <u>not</u> require the use of a rating that is separate from the application and credit history data. Rather, the system recited in claim 11 encompasses using the application and credit history data directly to locate an offering; it "process[es] said application data and said credit history data for said applicant to locate . . . at least one financial offering . . ., said at least one financial offering meeting selection criteria for at least one of said plurality of participating financial institutions." 8:52–57. All of the other independent claims of the '617 patent recite using a rating <u>"determined," "assign[ed]," or "provid[ed]" using</u> application and / or credit history data, rather than the application and credit history data directly, to locate offerings.

For all of the reasons stated in LendingTree's opening brief, claims 1, 6, 10 and 19 require deriving a rating that is distinct from the application data and credit history data collected for the applicant.

## B. LendingTree's Construction Is Consistent with the Court's Prior Claim Construction Order

LendingTree's proposed construction is entirely consistent with the Court's prior Markman Order. Block's contention that LendingTree is attempting to "undo" the Court's previous construction of "rating" lacks any merit.

LendingTree's current position is not in tension with the previous Markman Order for two reasons. First, it is irrelevant to the present dispute whether the term "rating," standing alone, is limited to derived values. Rather, the question is whether the various phrases reciting

---

effective filing date for the '617 patent by over ten years. *See PC Connector Solutions*, 406 F.3d at 1363.

how a rating is "assign[ed]," "determined" or "provid[ed]" in the claims of the '617 impose the requirement that the ratings recited in those claims are derived from the application data, credit history data, or both.

Second, Block misreads the claim construction order, which does not answer the broad question of whether a "rating" must be a value that is derived from, but separate from, the application and credit history data. The parties' dispute for the claims of the '645 patent was narrower: whether a "rating" is limited to the particular calculated "grade/score" combination described in the specification of the '645 patent. LendingTree's proposed construction for "rating" was "a letter grade and a numerical score (e.g., A-760) assigned to the applicant calculated based on the application data." Markman Order at 10. The Court did not adopt LendingTree's construction, but expressly reserved judgment on whether the rating must be some kind of calculated or derived value, whether a grade/score or something else. "Defendant's proffered definition of 'rating' goes further than necessary to impose a calculation requirement – assuming such a requirement exists – because the grade/score can take other forms and still be the product of a calculation as posited by Defendant." *Id.* at 12.

The passage from the Markman Order cited by Block is not to the contrary. Quoted in full, the passage is as follows (Block's selection emphasized):

> Defendant believes the requirement of a calculation excludes the possibility that a financial institution will "borrow a preexisting value or measure from one aspect of the borrower's financial or credit profile – such as an applicant's credit score or income level – and compare that to a single lender criteria." Defendant's Markman Brief at 19. <u>A necessary corollary of this argument is the existence of a list of criteria that *must* be considered in establishing the rating, but no such list exists.</u> In any event, the extent of effort necessary to conduct a "calculation" is beyond the scope of the present discussion. Defendant's proffered definition of "rating" goes further than necessary to impose a calculation requirement – assuming such a requirement exists – because the grade/score can

17

> take other forms and still be the product of a calculation as posited
> by Defendant.

*Id.* at 11-12. This passage is not applicable to the current dispute. For the disputed terms of the '617 patent, LendingTree is not arguing that there is any "list of criteria that must be considered in establishing the rating," or that the calculation must require a particular "extent of effort." Rather, as set forth in LendingTree's opening brief, claims 1, 6, 10 and 19 of the '617 patent require that the rating be derived from, but separate from, the application data, credit history data, or both.

## IV.    "grading system process"

Block's proposed construction for "grading system process" is wrong because it does not even require a "grade." Instead, Block states that a "grading system process" is "any process that uses application data, as well as other data, as input to determine which financial offers may be presented to an applicant." Opening Brief at 15.

A comparison of claims 11 and 13 reveals why Block's proposed construction is incorrect. Claim 11 recites "process[ing] said application data and said credit history data for said applicant to locate . . . at least one financial offering . . ., said at least one financial offering meeting selection criteria for at least one of said plurality of participating financial institutions." 8:52–57. This claim limitation includes all of the elements of Block's proposed definition for "grading system process": using application data and "other data" (credit history data), the system "determine[s] which financial offers may be presented to an applicant."

Claim 13 adds to claim 11 the requirement that "said at least one financial offering for said applicant is located in accordance with a grading system process." 9:1–3. Under Block's construction, claim 13 would be identical in scope to claim 11 because claim 11 already recites a "grading system process" as defined by Block. The Federal Circuit has

18

repeatedly held that the principle of "claim differentiation" requires that dependent claims have narrower scope than their parent claims, unless the claim language supports no other interpretation. *See, e.g., Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."); *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

The difference between claims 11 and 13 is clear: claim 13 requires the use of a "grading process" to determine which offerings are presented to the applicant, while claim 11 does not. As explained in LendingTree's opening brief, a "grading system process" is a "process of calculating a grade." Block's alternate proposal does not address the claim language, the scope of the independent and dependent claims, or the uniform description in the specification of the calculation involved in the "grading system process." LendingTree's proposed construction is therefore correct.

## V.      "using a computer" / "computer user"

LendingTree does not understand there to be any actual difference between the parties' positions with respect to the terms reciting "using a computer" or a "computer user." LendingTree's proposed construction requires that the user "provid[e] information to or receiv[e] information from a computer." Block objects in its opening brief that the information received by the user may have originated on a "remote server." LendingTree does not understand its construction to preclude that possibility. Instead, LendingTree's construction requires only that a user provide information to or receive information from a computer, regardless of the ultimate origin or destination of that information.

19

Despite further attempts by the parties to reach an agreed definition, Block continues to assert that the term should be given its "plain meaning." As LendingTree has stated in its opening brief, if there is a dispute, then advancing "plain meaning" as a construction is inappropriate because it shifts the task of claim construction to the jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008). LendingTree's proposed construction in fact captures the "plain meaning," and should be adopted.

## VI. "prompting an applicant using a computer"

LendingTree also does not understand there to be any actual dispute between the parties for this term. LendingTree's original proposed construction was "displaying <u>questions</u> to an applicant on a computer display." Block objected in its opening brief that LendingTree's proposed construction requires the prompt to be phrased as a "question." LendingTree did not intend its proposed construction to be so limited. The parties have met and conferred, and LendingTree has modified its proposed construction to be "displaying <u>prompts</u> to an applicant on a computer display." Despite that modification, Block continues to assert only that the term should be given its "plain meaning." For the reasons stated above in connection with "using a computer," Block's position should be rejected.

## VII. "credit card offering"

In its opening brief, Block does not offer arguments in support of its proposed construction for "credit card offering." For all of the reasons set forth in LendingTree's opening brief, LendingTree's proposed constructions for those terms should be adopted.[9]

---

[9] To the extent that Block makes arguments in its responsive brief that are not addressed by LendingTree's opening brief, and which cannot be addressed in this brief because Block has not disclosed them, LendingTree reserves the right to seek leave to file a reply brief to address them.

## VIII. "said applicant's computer"

The parties have met and conferred regarding this term, and have reached agreement that "said applicant's computer" means "the computer used by the applicant."

## IX. Conclusion

For the reasons stated above, and in LendingTree's opening brief, the Court should enter an order adopting the following constructions:

| Term | Construction |
|---|---|
| "financial card data" | "data that relate to a financial card and include data for the financial card, e.g., type of card, interest rate, fees, APR, credit limit, incentive programs, etc., that are presented to consumers for consideration in deciding whether to select the card" |
| "financial offering data" | "data that relate to a financial offering and include data for the financial offering, e.g., type of offering, interest rate, fees, APR, credit limit, incentive programs, etc., that are presented to consumers for consideration in deciding whether to select the offering" |
| "assigning a rating to said computer user based on said analyzing of said application data" | "deriving a rating for the computer user based on the application data and associating it with the computer user" |
| "providing a rating for said financial card applicant" | "deriving a rating for the applicant and associating it with the applicant" |
| "rating determined in accordance with said application data concerning said financial card applicant and said data from said third party sources" | "rating derived using the application data and third party data" |
| "assigning a financial risk rating" | "deriving a financial risk rating for the applicant and associating it with the applicant" |
| "grading system process" | "a process of calculating a grade" |
| "financial card" / "electronic | "a tangible piece of plastic or similar material issued by a financial institution that authorizes the cardholder to purchase |

| | |
|---|---|
| financial card" | goods and services on credit or by debiting a bank account, for example, a credit card or debit card" |
| "using a computer" | "providing information to or receiving information from a computer" |
| "computer user" | "a person providing information to or receiving information from a computer" |
| "prompting an applicant using a computer" | "displaying prompts to an applicant on a computer display" |
| "credit card offering" | "credit card" |
| "said applicant's computer" | "the computer used by the applicant" |

## X.    Oral Argument

LendingTree requests oral argument on the parties' claim construction positions, as well as on LendingTree's co-pending Motion to Strike Exhibits C-E of the Engle Declaration and Dictionary Definition of "accordance."

Respectfully submitted,

Dated:  December 5, 2008                    /s/ Winslow B. Taub

Robert D. Fram (Admitted Pro Hac Vice)
Winslow B. Taub (Admitted Pro Hac Vice)
Leslie N. Harvey (Admitted Pro Hac Vice)
**COVINGTON & BURLING LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 591-6000 / Fax: (415) 591-6091
rfram@cov.com
wtaub@cov.com
lharvey@cov.com


Edward R. Spalty (Missouri Bar No. 26086)
David A. Jermann (Missouri Bar No. 51389)
ARMSTRONG TEASDALE LLP
2345 Grand Boulevard, Suite 2000
Kansas City, Missouri 64108-2617
Tel: (800) 243-5070 / Fax: (816) 329-5426
espalty@armstrongteasdale.com
djermann@armstrongteasdale.com


ATTORNEYS FOR LENDINGTREE, LLC

23

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of **LENDINGTREE, LLC'S**

**RESPONSIVE CLAIM CONSTRUCTION BRIEF** was electronically filed with the Clerk of

Court on this 5th day of December, 2008 using the CM/ECF system, which sent notification of

such filing to the following:

Jeffrey S. Standley
F. Michael Speed, Jr.
Mark R. Engle
Standley Law Group LLP
6300 Riverside Drive
Dublin, OH 43017
Tel.: 614-792-5555
Fax: 614-792-5536
jstandley@standleyllp.com
mspeed@standleyllp.com
mengle@standleyllp.com


Mark W. Brennan
BRYAN CAVE LLP
3500 One Kansas City Place
1200 Main Street, Suite 3500
Kansas City, MO  64015-2100
Tel.:  816-374-3200
Fax:  816-374-3300
mwbrennan@bryancave.com


                /s/ Winslow B. Taub

                ATTORNEY FOR LENDINGTREE, LLC