IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| BLOCK FINANCIAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 01-1007-CV-W-3-ODS |
| | ) | |
| LENDINGTREE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| LENDINGTREE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 08-0164-CV-W-ODS |
| | ) | |
| BLOCK FINANCIAL CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

SECOND CLAIM CONSTRUCTION ORDER

I. Introduction

This case started with Block Financial Corporation's ("Block's") allegation that LendingTree, LLC ("LT") infringed its Patent No. 6,014,645 entitled "Real-Time Financial Card Application System" ("the '645 Patent"). On September 27, 2007, the Court issued its Claim Construction Order. On December 18, 2007, the United States Patent & Trademark Office ("PTO") issued Block Patent No. 7,310,617 entitled "Real-Time Financial Card Offer and Application System" ("the '617 Patent"). On March 6, 2008, LT filed suit seeking a declaration that the '617 Patent is invalid. The cases were consolidated into the first-filed suit. See Order dated June 24, 2008.

Now pending are the parties' arguments regarding construction of the '617 Patent. Due to the similarities between the patents[1], most of the parties' disagreements involve terms the Court already construed or discussed in its September 2007 Claim Construction Order. Therefore, the Court is not operating from a totally clean slate; its present ruling is more of a commentary or supplement to its prior Order than it is a crafted-from-scratch Claim Construction Order. The Court is mindful of the legal standards guiding claim construction; they were set out in Part I of the September 2007 Order and, in the interest of brevity, will not be replicated here. However, the Court applied those standards to many of the terms in the nearly-identical '645 Patent, and there is no need to duplicate the entire effort for the '617 Patent.

II. Disputed Terms

A. "Financial Card"

In the very first paragraph discussing this term for the '645 Patent, the Court stated it "agrees that [LT's] definition – 'a tangible piece of plastic or similar material issued by a financial institution that authorizes the cardholder to purchase goods and services on credit or by debiting a bank account, for example, a credit card or debit card'" – was the appropriate definition. The ensuing three-and-a-half pages explained the basis for the Court's conclusion and also explained why Block's use of the broader term "medium" was inappropriate. Nonetheless, Block insists the term "financial card" as used in the '617 Patent is broad and can include things that are not made of plastic or similar material, such as paper. Block reaches this conclusion by interpreting one sentence from the Court's discussion out of context. The Court stated

---

[1]The Court compared the two patents, and that examination failed to reveal any material differences between them. Most of the parties' arguments involve the Court's prior Order and do not depend on any purported differences between the patents or anything unique to the '617 Patent.

2

A "financial card" is not a technical term; it is one understood by ordinary people, and the Court has little difficulty concluding that the ordinary meaning of this phrase refers to a tangible piece of plastic or other material, possession and ownership of which entitles the owner to credit or other sources of money.

Block contends the Court's use of the phrase "plastic or other material" evinces the Court's conclusion that paper could qualify as a financial card. Block is wrong. The reference to "other material" is more general than the specific declaration that the "card" must be made of plastic or "similar material." In using that phrase, the Court meant other material similar to plastic. The composition of the card was not the focus of the inquiry – indeed, the Court did not and does not know the chemical composition of those items commonly recognized as credit cards and debit cards. Regardless of the chemical composition, the Court's point was (and remains) that the card is made of plastic or something like plastic – and paper is not like plastic.

This conclusion is foreshadowed by the content of the Court's discussion – which is a better way to glean meaning than Block's method of capturing an isolated snippet from a multi-page discussion. The Court noted the term "financial card" has acquired a meaning in the prior art involving the credit card industry, including (1) patents that depended on the ability to transmit or receive information from the card's magnetic strip and (2) multiple references to the credit card industry and how that industry works. Elsewhere, the Court (1) explained the PTO understood the term "loan" to be broader than the term "financial card" and (2) noted Block was required to narrow the '645 Patent to convince the PTO that it was not already embraced by a prior patent covering a broader universe of loan applications (the DeFranscisco Patent). Accepting Block's present interpretation – that paper (i.e., checks and other negotiable instruments) are "financial cards" – is inconsistent with the Court's reasoning and conclusions.[2] There

---

[2]The full import of Block's interpretation also demonstrates its unreasonableness. If Block's definition is accepted, a check becomes a "financial card," so an online application for a simple checking account would be an application for a "financial card." This is not a fair description of the term as used in common parlance, the industry, or the patents in question.

3

are obvious differences between a financial card and a negotiable instrument – indeed, a negotiable instrument (which, unlike a financial card, is governed by Article 3 of the Uniform Commercial Code) *is* the debt.

The issue is really not simply "what is the item made of?" This question is merely a proxy for the real issue: what types of financial arrangements are described by the patents Block owns? In the Court's view, Block is attempting to expand the reach of its patents. Distorting the definition of "financial card" beyond its typically accepted meaning is one of its methods to this end. Block was free to clearly define the term in the manner it now posits when it applied for the patent; of course, past history indicates the PTO would not have approved the patent with such an expansive definition. The Court will not accept a definition that expands "financial card" to include things that ordinary people, the industry, and those who created the prior art did not consider to be "financial cards." Checks, whether part of a bank account or a means to draw on a line of credit, are not financial cards by any permissible stretch of the definition.

B.  "Financial Card Data"

Claim 11 from the '645 Patent described an "electronic method for applying for a financial card," part of which included "storing *financial card term data* for each of said participating financial institutions." (Emphasis supplied). Finding little difference in the parties' proposed definitions, the Court concluded "'financial card terms' are 'terms that relate to a financial card offer, e.g., type of offer, interest rate, fees, APR, credit limit, incentive programs, etc., that are pre-set by the financial institution and presented to consumers for consideration in deciding whether to accept the offer.'" While defining "financial card terms," the Court did not purport to define "financial card term *data*."

Claim 1 from the '617 Patent describes an "electronic method for storing financial card offers," the first part of which involves storing on a database "financial card data for participating financial institutions, said financial card data comprising terms for at least one financial card offer . . . ." Claim 10 describes a system for making offers available to the public via computer and includes a database "for storing said financial card data,

4

said financial card data . . . comprising selection criteria for at least one financial card offer."

LT suggests the definition of "financial card terms" from the '645 Patent is the same as the definition for "financial card data" from the '617 Patent. Block disagrees, contending the key to the Court's earlier ruling rests on a difference between "terms" and "data." Block also discerns a difference in the phrasing of these two terms because the '617 Patent describes "financial card data" as "*comprising* terms for at least one . . . offer.)" (emphasis supplied). Block suggests "financial card data" should be understood as "information about financial cards."

The Court is not completely persuaded by either party's arguments. First, the difference between Block's definition and LT's definition escapes the Court. When a consumer discusses "information" about a credit card offer, one speaks of its terms. Information, terms, and data all seem to be the same thing. Second, Block's allegation that the Court's first Order rested on some perceived difference between "data" and "terms" is simply fallacious, and the referenced portion of the Court's Order discusses a different matter entirely. Third, the referenced claims from both patents generally establish a process whereby a credit card offeror establishes (1) the terms/information for a credit card along with (2) the eligibility criteria for that card. The eligibility criteria are encompassed in a different term, so they are not encompassed in the present discussion regardless of whether one is referring to terms, information, or data. Therefore, "financial card terms" cannot mean any and all "information" about the "financial card" because it would then include "information" – the eligibility criteria – that is excluded from the definition of "financial card data." On the other hand, LT's equation of "financial card terms" and "financial card data" is not supported by the text.

The text provides a ready resolution. "Financial card data" consists of "financial card offers" from multiple offerors. Admittedly, the '645 Patent contemplated offers from multiple institutions, but never explicitly assigned a phrase to describe the entire collection of offers. The '645 Patent did utilize the phrase "financial card term data," which ends up being the same as the '617 Patent's use of "financial card data" because the '617 Patent declares "financial card data" consists of "terms for at least one financial

5

card offer from each of said participating financial institutions." Placed in context – which involves describing a database – the Court concludes "financial card data" is the term used to describe the collection of financial card offers from one or more financial institutions.

### C. "Financial Offering Data"

The parties agree that a "financial offering" means a "financial product." Claim 11 of the '617 Patent describes an electronic system comprising "a first database for storing . . . financial offering data for a plurality of participating financial institutions." Claim 19 describes a computerized system for "presenting electronic financial offerings" that includes "obtaining . . . financial offering data for participating financial institutions . . . ." Block contends "financial offering data" is simply "information related to a financial product," while LT contends the definition must include the terms offered to the consumer. The difficulty with Block's general definition is placing it within Claim 19. Claim 19 says the financial institution data "compris[es] financial institution selection criteria and financial offering data for participating financial institutions, wherein said financial institution selection criteria comprises financial risk ratings associated with financial offerings." "Financial institutions selection criteria" and "financial offering data" are separate things that combine to form "financial institution data," so "financial offering data" does not include "the financial risk ratings associated with financial offerings."

Block essentially argues that a consumer can qualify for one or more financial products based solely on the financial risk ratings, which is true. However, this does not reflect on the meaning of the distinct term "financial offering data." Strict adherence to Block's proposed definition would mean the consumer is never presented with the terms of the offer. The ensuing claims discuss presenting the "financial offer," but the "financial offer" is the package itself, consisting of "selection criteria" and "terms." If the interest rate, annual fee, etc., are not part of the "selection criteria," then that information can only come from the "financial offering data."

6

### D.  Terms Employing the Word "Computer"

The parties' formulations of these terms reveal no viable dispute.  The terms ("applicant using a computer," "computer user," and "public network computer user") are amenable to easy understanding by laypersons and do not require judicial construction.

### E.  "Rating"/"Grading System Process"

Several claims in the '617 Patent require a "rating" of one sort or another.  This was also true of the '645 Patent.  LT resurrects an argument rejected in the Court's earlier order: that a "rating" must be preceded by some form of mathematical calculation.  As with the '645 Patent, there is no textual requirement that the rating take any particular form, consider any particular criteria, or come from any particular source.

Block contends the term should mean "a value or measure assigned to the applicant," which is the same definition it proposed for the '645 Patent and which was adopted by the Court.  LT contends this definition means the rating can be based on only part of the application or credit history, which is correct – but not fatal.  Other claims refer to the acquisition of historical information, but nothing requires that any part of it be used, or that any of it be used in a particular way.  In short, a rating can be derived through a mathematical formula – but it does not have to be.  The Court adheres to the definition it already adopted for this term.

The preferred embodiments also describe a "grading system process," which raises some of the same issues discussed in the context of "ratings."  The "grading system process assigns a grade/score to the applicant by using the application data and other information such as credit bureau data to derive a letter grade and a numerical score (e.g., A-760)."  It does not specify that the process must include a mathematical calculation, so the Court will not ascribe a definition that requires one.
IT IS SO ORDERED.

                                                                  /s/ Ortrie D. Smith
                                                                  ORTRIE D. SMITH, JUDGE
DATE: February 19, 2009                     UNITED STATES DISTRICT COURT