# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| BLOCK FINANCIAL LLC, (formerly known as "BLOCK FINANCIAL CORPORATION") | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 01-1007-cv-ODS |
| LENDINGTREE, LLC, | ) ) | |
| Defendant. | ) ) | |
| LENDINGTREE, LLC, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 08-cv-164-ODS |
| BLOCK FINANCIAL LLC, (formerly known as "BLOCK FINANCIAL CORPORATION") and DOES 1 through 10, inclusive, | ) ) ) ) | |
| Defendants. | ) | |

## LENDINGTREE, LLC'S SUGGESTIONS IN SUPPORT OF LENDINGTREE, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. SECTION 112, ¶ 1 FOR LACK OF WRITTEN DESCRIPTION

# TABLE OF CONTENTS

Page

I.     Introduction ................................................................................................................ 1

II.    Statement of Uncontroverted Material Facts ..................................................... 2

       A.     U.S. Patent No. 6,014,645 ........................................................................... 3

       B.     U.S. Patent No. 7,310,617 ........................................................................... 3

       C.     Specification of the Patents-In-Suit ......................................................... 4

       D.     Court's Claim Construction Orders of 9/27/2007 and 2/19/2009 .......... 8

              1.     "Financial Card" ............................................................................. 8

              2.     "Financial Offering" ..................................................................... 11

       E.     Claims at Issue in This Motion (Claims 11, 13-19, 21-25 of the '617 Patent) ........................................................................................................ 12

              1.     Independent Claim 11 .................................................................. 12

              2.     Independent Claim 19 .................................................................. 13

III.   Legal Standard ........................................................................................................ 15

       A.     Summary Judgment ................................................................................... 15

       B.     Written Description Requirement Under 35 U.S.C. § 112, ¶ 1 ............. 15

IV.    Argument .................................................................................................................. 17

V.     Conclusion ............................................................................................................... 20

# TABLE OF AUTHORITIES

Page

CASES

*Air Turbine Tech., Inc. v. Atlas Copco AB*,
  410 F.3d 701 (Fed. Cir. 2005)..................................................................................15

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989)................................................................................................15

*Capon v. Eshhar*,
  418 F.3d 1349 (Fed. Cir. 2005)..............................................................................15

*In re Curtis*,
  354 F.3d 1347 (Fed. Cir. 2004)..............................................................................20

*LizardTech Inc. v. Earth Res. Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005)..............................................................................18

*Lockwood v. Am. Airlines*,
  107 F.3d 1565 (Fed. Cir. 1997)..............................................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................................15

*Mukherjee v. Chu*,
  217 F. App'x 971 (Fed. Cir. 2007) ...................................................................18, 19

*PIN/NIP, Inc. v. Platte Chem. Co.*,
  304 F.3d 1235 (Fed. Cir. 2002)..............................................................................17

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
  522 F.3d 1299 (Fed. Cir. 2008)..............................................................................20

*Tronzo v. Biomet, Inc.*,
  156 F.3d 1154 (Fed. Cir. 1998)................................................................16, 18, 20

*Turbocare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*,
  264 F.3d 1111 (Fed. Cir. 2001)..........................................................16, 17, 18

*Tyler v. Harper*,
  744 F.2d 653 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985).......................15

*Univ. of Rochester v. G.D. Searle & Co., Inc.*,
  358 F.3d 916 (Fed. Cir. 2004)..........................................................................16, 17

*Vas-Cath Inc. v. Mahurkar*,
　935 F.2d 1555 (Fed. Cir. 1991)...........................................................................16

*Williams v. City of St. Louis*,
　783 F.2d 114 (8th Cir. 1986) ...............................................................................15

**STATUTES**

37 C.F.R. Section 1.8(a)(2)(i)(A)...............................................................................20

35 U.S.C. § 112, ¶ 1 ...............................................................................2, 15, 16, 20

35 U.S.C. § 120...............................................................................16

35 U.S.C. § 132...............................................................................16

**RULES**

Fed. R. Civ. P. 56(e) ...............................................................................15

# I.      Introduction

Several asserted claims of U.S. Patent No. 7,310, 617 (the "'617 Patent") are invalid for lack of written description, because they claim subject matter not disclosed anywhere in the specification.  Those claims are directed to an electronic system and method for retrieving "financial offerings" based on applicant data.  But the specification does not support these broad claims.  The specification never speaks of "financial offerings."  Instead, it discusses the claimed invention in terms of only a single, specific type of "financial offering" – namely, a "financial card."  But there is no mention in the specification of "financial offerings" generically or of any type of financial offering other than a "financial card."

The Court already reached this conclusion during claim construction.  In rejecting Block Financial Corporation's repeated attempts to construe "financial card" expansively to cover other financial products such as checks, the Court held that "not all acquisitions of credit (or other accesses to money) are described [in the specification]; *only* those that can be accessed via the use of a 'financial card' are described."  9/27/2007 Claim Construction Order (Document No. 62) at 5 (emphasis added).  The Court stated:

> In the Court's view, Block is attempting to expand the reach of its patents.  Distorting the definition of "financial card" beyond its typically accepted meaning is one of its methods to this end.  Block was free to clearly define the term in the manner it now posits when it applied for the patent; of course, past history indicates the PTO would not have approved the patent with such an expansive definition.

2/19/2009 Second Claim Construction Order (Document No. 129) at 4.  The Court held that the prosecution history of the asserted patents further evidenced that the patents only covered financial cards:

> Plaintiffs response to the PTO is replete with references to the "credit card industry." At no time did Plaintiff suggest its invention could be used for other financial products, nor did Plaintiff utilize a

1

term with greater breadth than "financial card." Indeed, to now argue for a more abstract understanding of the phrase appears inconsistent with the position Plaintiff took to persuade the PTO to reverse its initial rejection of the patent.

9/27/2007 Claim Construction Order at 5.

Because the term "financial offerings" covers an array of instruments aside from financial cards, the specification fails to disclose that Block had possession of anything more than an electronic system and related method that allow an applicant to retrieve and review financial *card offers* and, as such, the asserted "financial offerings" claims (independent claims 11 and 19 and dependent claims 13-17, and 21-25 of the '617 Patent) are invalid for lack of written description under 35 U.S.C. § 112, ¶ 1.

## II.    Statement of Uncontroverted Material Facts

1.    Block's Complaint and Counterclaim[1] allege that LendingTree's systems infringe U.S. Patent No. 6,014,645 (the "'645 Patent"), entitled "Real-Time Financial Card Application System," and U.S. Patent No. 7,310,617 (the "'617 Patent"), entitled "Real-Time Financial Card Offer and Application System" (collectively, the "patents-in-suit."). *See* Complaint at ¶¶ 6-7; Counterclaim at ¶¶ 19-20; *see also* Exhibits A ('645 Patent) and B ('617 Patent) to the Declaration of Deanna L. Kwong in support of LendingTree's Motion for Summary Judgment ("Kwong Dec.").[2]  Block has asserted, *inter alia*, claims 11, 13-17, 19 and 21-25 of the '617 Patent in this action.  Kwong Dec., Exh. C.

---

[1] Block's Complaint is Document No. 1, filed in Case No. 01-1007-cv-ODS.  Block's Counterclaim is Document No. 14, filed in Case No. 08-cv-164-ODS.  On June 24, 2008, the Court ordered the cases consolidated.  *See* Document Nos. 89 and 90.

[2] Although attached as Exhibits A and B to the Kwong Dec., for ease of reference, all cites herein to the patents-at-issue are to the "'645 Patent" and the "'617 Patent."

### A.      U.S. Patent No. 6,014,645

2.      The '645 Patent issued from U.S. Patent Application No. 08/635, 334 ("the '334

Application"), filed on April 19, 1996.  '645 Patent Cover Page.

3.      The '645 Patent issued on January 11, 2000.  '645 Patent Cover Page.

4.      The '645 Patent contains claims directed to "financial cards," but has no claims using the

term "financial offerings."  '645 Patent at 6:44-10:6.

### B.      U.S. Patent No. 7,310,617

5.      On June 1, 1999, before the '645 Patent had issued, Block filed a "continuation

application," Application No. 09/323,715 ("Continuation '715 Application"), to its

original '334 Application.  Kwong Dec., Exh. D-1 at p. 1[3].

6.      Claims using the term "financial offerings" were not in the Continuation '715

Application as filed on June 1, 1999, but instead were added in a communication that the

U.S. Patent and Trademark Office ("USPTO") received on February 8, 2002.  Kwong

Dec., Exh. D-2.

7.      The '617 Patent issued on December 18, 2007, and claims priority to the April 19, 1996

filing date of the '334 Application.  '617 Patent Cover Page.

8.      Both the '617 Patent and the '645 Patent list Cordon Cotter Cunningham as the sole

inventor and Block as the assignee.  '645 Patent Cover Page; '617 Patent Cover Page.

---

[3] Exhibits D-1 and D-2 consist of excerpts from the '617 file history.  Kwong Dec. ¶ 4.

### C. Specification of the Patents-In-Suit

9.     The '617 Patent and the '645 Patent share the same specification. *Compare* '645 Patent at 1:1-6:43 *with* '617 Patent at 1:1-6:47; *compare* '645 Patent, Abstract *with* '617 Patent, Abstract.

10.    The term "financial offering" appears nowhere in the specification of the patents-in-suit. '617 Patent at 1:1-6:47; '645 Patent at 1:1-6:43.

11.    The specification of the patents-in-suit states that "the present invention relates to an online, real-time system that allows a user to submit *financial card* application data and accept a *financial card* offer from a participating financial institution as based on predefined applicant selection criteria." '617 Patent at 1:13-17 (emphasis added).

12.    The specification of the patents-in-suit describes prior art direct mailings of *financial card* applications to potential customers:

> 2. Description of Related Art
>
> Financial institutions interested in locating new customers for their *financial cards (such as credit cards, debit cards, etc.)* often rely on direct mailings. These institutions may review personal information regarding income, education, assets (e.g., home ownership), and credit histories before deciding to solicit certain potential customers. In addition, the institutions determine the terms of the *financial card* offer (e.g., credit limit, interest rate, yearly fee, etc.) which are known in the industry as the "federal boxes." Using detailed selection criteria (e.g., female college graduates who own homes and have incomes over $25,000.00) and offer terms, an institution may send *financial card* applications to potential customers. These direct mailings are very expensive given the number of recipients who actually respond. The number is generally believed to be less than two percent (2%). Furthermore, because of the lead time and intensive labor required for printing, assembling, and mailing the *financial card* application packages, an institution must determine the selection criteria and the *financial card* terms long before the packages are sent. For a given direct mail campaign, once the process begins, there is little, if any, opportunity to change either the selection criteria or the terms. As a result, there is little opportunity to

4

experiment or tune the process to find the most successful combinations of selection criteria and associated financial card terms. Even if the financial institution is willing to incur the costs associated with multiple direct mail campaigns, the target recipients may resent the repeated solicitations.

In addition to the disadvantages of the process for financial institutions, potential customers are also inconvenienced. Those direct mail recipients who are not interested in the offers must sort the "junk mail" from their regular personal and business mail. Those recipients who are interested in the offers must complete the applications manually, mail them back to the financial institutions, wait for them to be processed, and then wait for the financial card to arrive in the mail. Furthermore, some interested customers simply may be missed because, for a variety of reasons, they never make it on a mailing list. Customers who decide to shop on their own for a new *financial card* may be required to make inquiries at a number of financial institutions, each of which must analyze the applicant's data to determine which, if any, card is appropriate for the applicant. This process is time-consuming because multiple telephone calls are needed and the same information must be repeated for each institution. Furthermore, the potential customer may need to take notes regarding each offer or wait for offer information in the mail in order to compare the offers.

In general, the direct mail method makes it difficult for financial institutions and potential customers to connect. First, the application package may get lost in the mail or, if the intended recipient has moved, the application package may never reach the intended recipient. The inability to easily alter selection criteria and associated *financial card* term data may mean that would-be customers are excluded from the direct mail process. The lack of a single source of *financial card* application information makes it difficult for potential customers to learn of or review their options.

'617 Patent at 1:19-2:10 (emphasis added).

13.    The specification of the patents-in-suit identifies disadvantages of the prior art direct

mailing process for the financial institutions interested in locating new customers for their

financial cards, which include the expensiveness of the mailings, in light of the number of

recipients who actually respond; the lead time and intensive labor required for printing,

assembling, and mailing the financial card application packages; and the "little

5

opportunity to experiment or tune the process to find the most successful combinations of selection criteria and associated financial card terms." '617 Patent at 1:42-44; *see generally id.* at 1:20-47.

14.     The specification of the patents-in-suit also identifies disadvantages of the prior art direct mailing process for potential customers of financial cards, which include the receipt of "junk mail" that they must sort through; the need to complete applications manually, mail them back, wait for them to be processed, and then wait for the financial cards to arrive in the mail; the omission of some potential customers from mailing lists for financial cards; and the time-consuming process for customers who decide to shop for a new financial card on their own and must make multiple telephone calls to different financial institutions.  *See generally* '617 Patent at 1:47-67.

15.     The specification of the patents-in-suit explains that the claimed invention "recognizes the limitations of using direct mailings for matching financial institutions and their card offerings with new customers" and "offers substantial benefits to financial institutions and potential financial card customers" by addressing those limitations of the direct mailing process for financial card applications.  '617  Patent at 2:14-16, 6:29-34.

16.     The specification describes *the present invention* in terms of *card* offers and *card* offerings:

>       A system is disclosed for presenting *financial card (e.g., credit card, debit card)* offers to potential customers. Financial *card* applicant selection criteria and financial *card* term data are provided by participating financial institutions. An applicant interested in applying for a new financial *card* accesses the system via the Internet/World Wide Web. The applicant provides personal and financial data that are then analyzed in conjunction with data from outside sources (such as credit bureaus) to determine a financial risk rating for the applicant. The rating is used to locate financial *card* offers appropriate for the applicant. The applicant

6

then peruses the offers and chooses one that meets his or her personal selection criteria. The applicant's data is then forwarded for processing to the participating financial institution that made the selected offer.

'617 Patent, Abstract (emphasis added).

The *present invention* recognizes the limitations of using direct mailings for matching financial institutions and their *card* offerings with new customers. The *present invention* is a sophisticated computer system that allows users to peruse and accept *financial card* offers from financial institutions interested in locating new customers who meet specific selection criteria.

'617 Patent at 2:14-20 ("Summary of the Invention"; emphasis added).

The ability to alter online financial risk ratings and associated financial *card* term data in a substantially continuous, real time manner--a unique aspect of the *present invention*--results in substantial benefits to both financial institutions and financial *card* customers that direct mail and other forms of offers do not provide due to their static nature.… Consequently, potential customers are more likely to find a financial *card* appropriate for their circumstances (e.g., because the grade/score associated with particular term data has changed, or because the term data associated with a particular grade/score has changed, or because new grade/score and term data pairs have been defined.) *Using the present invention*, customers, who one day are unable to locate a financial *card* that meets their needs, may, the next day, find one that meets their needs. Consequently, both the customer who accepts the financial *card* offer and the financial institution that sponsors the offer benefit.

'617 Patent at 5:51-6:6 (emphasis added).

The *present invention* offers substantial benefits to financial institutions and potential financial *card* customers. Using the *present invention*, financial institutions may easily alter selection criteria and associated financial *card* term data as well as increase the types of offers in order to locate new customers. Significant cost savings may be realized by use of the electronic means of the present invention, rather than direct mailings, to present financial *card* offers. Financial institutions and potential customers are more likely to connect with one another using the present invention because customers are not required to be in any particular physical location in order to receive an offer. Furthermore, they may review, at their own convenience, a variety of options from a

7

variety of institutions via a single access point thus reducing the
amount of time required to shop for a new ***card***.

'617 Patent at 6:29-44 (emphasis added).

17.    The specification of the patents-in-suit describes the preferred embodiment of the present

invention as a "***Financial Card*** Application Service (***Card*** Service)… an electronic

***financial card*** application system implemented using the Internet's World Wide Web

(WWW) technology."  '617 Patent at 2:51-54 (emphasis added).

18.    No financial products other than financial cards are described or mentioned in the

specification of the patents-in-suit.  '617 Patent at 1:1-6:47.

**D.    Court's Claim Construction Orders of 9/27/2007 and 2/19/2009**

**1.    "Financial Card"**

19.    The Court adopted LendingTree's proposed construction of the claim term "financial

card" to mean "a tangible piece of plastic or similar material issued by a financial

institution that authorizes the cardholder to purchase goods and services on credit or by

debiting a bank account, for example, a credit card or debit card."  9/27/2007 Claim

Construction Order at 4.

20.    The Court rejected Block's proposed definition of "financial card," which was "any

medium issued to a holder that provides access to financial benefits and resources."  *Id.*

21.    In rejecting Block's construction, the Court reasoned as follows:

    Plaintiffs definition utilizes the broader - and more
    ambiguous - term "medium."  This is an attempt to define an
    ordinary term that is readily understood in a manner that
    improperly expands the meaning beyond its customary
    understanding. A "financial card" is not a technical term; it is one
    understood by ordinary people, and the Court has little difficulty
    concluding that the ordinary meaning of this phrase refers to a
    tangible piece of plastic or other material, possession and
    ownership of which entitles the owner to credit or other sources of
    money. This ordinary understanding of the phrase is confirmed by

8

its usage in the patent and other components of the prosecution history. The '645 Patent's Abstract describes the invention as a "system . . . for presenting financial card (*e.g.*, credit card, debit card) offers to potential customers." The Background of the Invention compares the invention to the use of direct mail campaigns to solicit customers, and observes the shortcomings of such efforts include the need for prospective customers to "complete the applications manually, mail them back to the financial institutions, wait for them to be processed, ***and then wait for the financial card to arrive in the mail***." Col. 1, lines 47-51 (emphasis supplied). The Detailed Description of Preferred Embodiments ("Preferred Embodiments") summarizes the process as concluding when "[t]he financial institution processes the application and makes arrangements to send the financial card to the applicant." Col. 5, lines 3-5. The Summary of Invention describes the final step of the process as occurring when "a financial card in accordance with accepted offer terms is sent to the user." Col. 2, lines 28-29. This is reiterated in Claim 25, which consists of "[t]he method of claim 24 further comprising the step of sending to said applicant a financial card in accordance with said offer accepted by said applicant." Col. 8, lines 18-20. All of these references contemplate the "financial card" as a tangible item, and further contemplate the receipt of the financial card as both a necessary part of, and the culmination of, the process. In context, the card does not merely represent a token confirming a financial relationship, but is the means by which financial transactions are to be conducted. ***Therefore, not all acquisitions of credit (or other accesses to money) are described; only those that can be accessed via the use of a "financial card" are described.***

Some of Plaintiffs statements during the initial examination process confirm the meaning gleaned from the patent itself. The PTO initially indicated it was rejecting certain claims because it regarded a financial card as "an abstract concept" and "merely a representation of the abstraction and therefore merely a model." In insisting "that the distribution, review, and acceptance or rejection of financial card offers is a real world activity," Plaintiff discussed current practices in the credit card industry and noted "[i]t is very difficult for credit card companies to determine if their marketing efforts are effective and whether they are soliciting appropriate candidates." Amendment to Patent Application filed February 2, 1999. ***This is merely one example; Plaintiffs response to the PTO is replete with references to the "credit card industry." At no time did Plaintiff suggest its invention could be used for other financial products, nor did Plaintiff utilize a term with greater breadth than "financial card." Indeed, to now argue for a more abstract understanding of the phrase appears inconsistent with***

9

*the position Plaintiff took to persuade the PTO to reverse its
initial rejection of the patent.*

....

Finally, by means of confirmation, the Court observes the
prior art's use of the phrase is consistent with the Court's
interpretation. See Arthur A. Collins, Inc. v. Northern Telecom
Ltd., 216 F.3d 1042, 1044-45 (Fed. Cir. 2000) ("Even when prior
art is not cited in the written description or the prosecution history,
it may assist in ascertaining the meaning of a term to a person
skilled in the art."). For instance, Patent No. 5,619,559 Financial
Card Authorization System - "relates generally. . . to a system for
authorization of financial card transactions." The Background and
Summary of the Invention explains that "[f]inancial cards, usually
credit cards, are commonly used by purchasers in retail
establishments," and proceeds to explain the use of an electronic
device to obtain information from the card and transmit it to a
financial institution to insure verification of the card and approval
for the transaction. Col. 1, lines 14-28. Patent No. 5,038,022 -
Apparatus and Method for Providing Credit for Operating a
Gaming Machine - describes a device that "enables the player to
obtain credit without having to leave his place at the [gaming]
machine with the use of a financial card of the type such as any
well known credit card or a debit card such as an ATM card." Col.
3, lines 15-19. The patent elsewhere discusses use of an electronic
reader that transfers data to and from the magnetic strip on the
card. These and other examples confirm not only that a financial
card is a tangible object, but also that the tangible object is more
than a mere talisman confirming a contractual relationship between
the customer and the financial institution.

Plaintiff contends the term "financial card" should be given
a broad meaning. Even if the meaning is broad, it is not limitless
or malleable, and is not amenable to the breadth Plaintiff would
accord it. Plaintiff suggests it could have explicitly limited the
phrase in the manner Defendant suggests, which is true - but this
does not mean the definition of "financial card" is not *already*
limited in light of the meaning it already has.

Plaintiff also contends the PTO understood the term to be
as broad as Plaintiff now suggests, but the Court is not
persuaded....

Finally, Plaintiff relies on another communication from the
PTO dated July 16, 2004, that rejected certain claims in the '645
Patent due to obviousness. On page four the PTO referenced that

10

portion of DeFranscisco [*sic*] indicating "[e]ach funding source is able to send back additional information, such as score, grade, etc.,....There is also a comment field to enter more complex things, for example, a list of rate/term options.'  Col. 13, lines 65- Col. 14 line 2." The PTO then referred to Figure 3Q from DeFranscisco [*sic*] "which shows financial card (i.e. loan) term data from a plurality of financial institutions." ***This reference does not clearly indicate the PTO interpreted "financial card" as coextensive with or more broadly than the word "loan." In fact, considering the context, it appears the PTO considered the term "loan" to be broader than and encompassing of "financial card," such that a "financial card" is only one type of a loan arrangement.*** At best, the PTO's usage on July 16, 2004, is ambiguous, and is insufficient to overcome the other clear sources cited above.

*Id.* at 4-8 (emphasis added).

22.     In its 2/19/2009 Claim Construction Order, the Court again rejected Block's attempt to

construe the term "financial card" broadly to encompass things other than cards:

>    The issue is really not simply "what is the item made of?"  This question is merely a proxy for the real issue: what types of financial arrangements are described by the patents Block owns? ***In the Court's view, Block is attempting to expand the reach of its patents.  Distorting the definition of "financial card" beyond its typically accepted meaning is one of its methods to this end. Block was free to clearly define the term in the manner it now posits when it applied for the patent; of course, past history indicates the PTO would not have approved the patent with such an expansive definition.*** The Court will not accept a definition that expands "financial card" to include things that ordinary people, the industry, and those who created the prior art did not consider to be "financial cards." Checks, whether part of a bank account or a means to draw on a line of credit, are not financial cards by any permissible stretch of the definition.

2/19/2009 Second Claim Construction Order at 4 (emphasis added).

### 2.      "Financial Offering"

23.     The parties agree that "financial offering" means "financial product."  *Id.* at 6.

**E.**    **Claims at Issue in This Motion (Claims 11, 13-19, 21-25 of the '617 Patent)**

**1.**    **Independent Claim 11**

24.    Independent claim **11** of the '617 Patent is directed to an "electronic financial offering system" comprised of the following:

> a first database for storing financial institution data comprising financial institution selection criteria and financial offering data for a plurality of participating financial institutions;
>
> a second database for storing credit history data for a plurality of individuals; and
>
> one or more servers connected to a public network adapted to:
>
> (a) obtain application data from an applicant using a computer connected to one of said servers using said public network;
>
> (b) enter said application data in memory at one of said servers;
>
> (c) obtain from said second database credit history data for said applicant in accordance with said application data;
>
> (d) enter said credit history data in memory at said one of said servers;
>
> (e) process said application data and said credit history data for said applicant to locate from said first database at least one financial offering for said applicant, said at least one financial offering meeting selection criteria for at least one of said plurality of participating financial institutions; and
>
> (f) present to said applicant for review at said applicant's computer at least one financial offering located for said applicant according to said application data, said credit history data, and said selection criteria for at least one of said plurality of participating financial institutions.

'617 Patent at 8:31-63.

25.    Dependent claim **13** of the '617 Patent adds to claim **11** the requirement that "at least one financial offering for said applicant is located in accordance with a grading system process." '617 Patent at 9:1-3.

12

26. Dependent claim **14** of the '617 Patent adds to claim **13** the requirement that the "grading system process assigns a grade/score to the applicant using the application data and credit history data and uses the grade/score to search each participating financial institution's selection criteria to locate the appropriate financial offerings." '617 Patent at 9:4-8.

27. Dependent claim **15** of the '617 Patent adds to claim **14** the requirement that "each financial institution's selection criteria are organized in a matrix associating financial offering data with a minimum grade/score combination." '617 Patent at 9:9-12.

28. Dependent claim **16** of the '617 Patent adds to claim **11** the requirement that "each of said at least one financial offering is presented to the applicant in a single computer display." '617 Patent at 9:13-15.

29. Dependent claim **17** of the '617 Patent adds to claim **11** the requirement that "at least one financial offering is presented in the form of a menu comprising a summary of said at least one financial offering from which the applicant may make a selection to review details of the financial offering." '617 Patent at 9:16-20.

30. Dependent claim **18** of the '617 Patent adds to claim **11** the requirement that "at least one financial offering is a credit card offering." '617 Patent at 9:21-22.

## 2. Independent Claim 19

31. Independent claim **19** of the '617 Patent is directed to a "computerized method for presenting electronic financial offerings" comprised of the following:

> obtaining financial institution data comprising financial institution selection criteria and financial offering data for participating financial institutions, wherein said financial institution selection criteria comprises financial risk ratings associated with financial offerings;
>
> storing said financial institution data in a first database; prompting an applicant using a computer for application data for use in

13

assigning a financial risk rating to said applicant to locate financial
offerings for said applicant;

receiving at a server from said applicant computer said application
data;

obtaining from a second database credit history data for said
applicant in accordance with said application data;

assigning a financial risk rating to said applicant in accordance
with said credit history data from said second database;

selecting from said financial institution data for participating
financial institutions financial offerings in accordance with said
financial risk rating and said financial institution selection criteria
for participating financial institutions; and

presenting to said applicant at said computer for review selected
financial offerings.

'617 Patent at 9:23-10:1-7.

32.     Dependent claim **21** of the '617 Patent adds to claim **19** the requirement that "assigning a

financial risk rating comprises assigning a rating in accordance with a grading system

process." '617 Patent at 10:13-15.

33.     Dependent claim **22** of the '617 Patent adds to claim **21** the requirement that the "grading

system process assigns a grade/score to the applicant using the application data and credit

history data and uses the grade/score to search each participating financial institution's

selection criteria to select financial offerings." '617 Patent at 10:16-20.

34.     Dependent claim **23** of the '617 Patent adds to claim **22** the requirement that "each

financial institution's selection criteria are organized in a matrix associating financial

offering data with a minimum grade/score combination." '617 Patent at 10:21-24.

35.     Dependent claim **24** of the '617 Patent adds to claim **19** the requirement that "presenting

to said applicant selected financial offerings comprises presenting each of said selected

financial offerings in a single computer display." '617 Patent at 10:25-28.

14

36.     Dependent claim **25** of the '617 Patent adds to claim **19** the requirement that "presenting

        to said applicant selected financial offerings comprises presenting selected financial

        offerings in the form of a menu comprising a summary of each financial offering from

        which the applicant may make a selection to review details of the financial offering."

        '617 Patent at 10:29-34.

**III.    Legal Standard**

     **A.     Summary Judgment**

                Summary judgment should be granted in favor of the moving party upon a

showing that "there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  *See generally Williams v. City of St. Louis*, 783 F.2d

114, 115 (8th Cir. 1986); *Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701, 707 (Fed. Cir.

2005).  Although the Court must view the evidence in the light most favorable to the non-moving

party, to oppose this motion Block "may ***not*** rely merely on allegations or denials in its own

pleading; rather, its response must -- by affidavits or as otherwise provided in [Rule 56] -- set

out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e) (emphasis added); *see*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575, 585-88 (1986); *Tyler v.*

*Harper*, 744  F.2d 653, 655 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985).

     **B.     Written Description Requirement Under 35 U.S.C. § 112, ¶ 1**

                The true beneficiary of a patent is not the patentee, but the public.  *See Bonito*

*Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989).  For this reason, the U.S.

patent system involves a *quid pro quo*:  In exchange for the right to exclude others from

practicing an invention, an applicant must disclose, in the patent itself, what he or she has

invented so that the body of public knowledge is thereby enhanced.  *See Capon v. Eshhar*, 418

F.3d 1349, 1357 (Fed. Cir. 2005). To this end, Section 112, ¶ 1 of the Patent Act sets forth a written description requirement, which provides: "The specification shall contain a written description of the invention . . . in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . ." 35 U.S.C. § 112, ¶ 1. This requires the patentee to disclose "all of the elements and limitations" of the invention in the specification. *See Univ. of Rochester v. G.D. Searle & Co., Inc*., 358 F.3d 916, 926 (Fed. Cir. 2004).

The purpose of the written description requirement is to prevent a patent applicant from later attempting to claim something that he or she did not actually invent as of the time of the filing date sought. *See Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991). "The written description requirement and its corollary, the new matter prohibition of 35 U.S.C. § 132, both serve to ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date." *Turbocare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co*., 264 F.3d 1111, 1118 (Fed. Cir. 2001). Furthermore, when an applicant adds new claims after the original filing date – through a continuation application or otherwise – "the new claims or other added material must find support in the original specification." *Id.*; *Tronzo v. Biomet, Inc*., 156 F.3d 1154, 1158 (Fed. Cir. 1998) ("For a claim in a later-filed application to be entitled to the filing date of an earlier application under 35 U.S.C. § 120 (1994), the earlier application must comply with the written description requirement of 35 U.S.C. § 112, ¶ 1 (1994).").

The test for meeting the written description requirement is whether the subject matter of the claims is ***actually disclosed*** in the specification – ***not*** whether one of ordinary skill in the art might be able to infer such disclosure from reading the specification. *See Lockwood v.*

16

*Am. Airlines*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997) ("It is the disclosures of the applications that count.  Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed.").

A written description may be plainly inadequate as a matter of law, even though the question of whether the specification conveys that the inventor possessed what is claimed is one of fact.  *See Univ. of Rochester*, 358 F.3d at 922-23 (a patent can be held invalid for failure to meet the written description requirement, based solely on the language of the patent specification).  The Federal Circuit has frequently affirmed the grant of summary judgment in patent cases based on the failure to satisfy the written description requirement.  *See id.* at 917; *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1248 (Fed. Cir. 2002); *TurboCare*, 264 F.3d at 1126.

It is well-settled that "a patent can be held invalid for failure to meet the written description requirement, based solely on the language of the patent specification.  After all, it is in the patent specification where the written description requirement must be met."  *Univ. of Rochester*, 358 F.3d at 927.  Such is the case here.

## IV.    Argument

The language within the four corners of the '617 Patent itself demonstrates that the asserted "financial offering" claims are invalid for lack of written description.  The specification simply does not support those broad claims.  The specification of the patents-in-suit repeatedly describes the present invention, not just merely an embodiment, ***only*** in terms of "financial ***cards*."  *See* '617 Patent at 2:14-20, 5:51-6:6, 6:29-34; *id.*, Abstract.  It makes clear that the purpose of the claimed invention was to solve problems associated with mass-market mailings of financial ***card*** offers.  There is no mention of "financial offerings" in the

specification. Nor is there any mention in the specification of any financial products other than financial cards. "Financial products" encompasses an array of financial instruments that include mortgages, personal loans, home equity loans, home equity line of credits, car loans, and student loans. As this Court has previously held, "***not all acquisitions of credit (or other accesses to money) are described; only those that can be accessed via the use of a "financial card" are described***." 9/27/2007 Claim Construction Order at 5 (emphasis added).

It is well-settled that when the disclosure in the patent specification is narrower than the scope of the claims, the claims lack support and are invalid for failure to satisfy the written description requirement. *See Mukherjee v. Chu*, 217 F. App'x 971, 973-75 (Fed. Cir. 2007) *LizardTech Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1339-40 (Fed. Cir. 2005); *Tronzo*, 156 F.3d at 1159; *Turbocare*, 264 F.3d 1111 at 1120.

*Tronzo* is controlling and instructive. There, the claims were directed to artificial hip implants having any shape of cup socket. 156 F.3d at 1156. The specification, however, "disclose[d] *only* conical shaped cups and nothing broader," and that "[t]here is nothing in the '589 specification to suggest that shapes other than conical are necessarily a part of the disclosure.'" *Id*. at 1159 (emphasis in original). The Federal Circuit held that the overly broad claims were invalid for lack of written description. *Id*. at 1160. As in *Tronzo*, what is actually disclosed in the specification of the patents-in-suit here is much narrower in scope than what is covered in the "financial offerings" claims. While those claims cover all types of financial offerings, the specification discloses only "financial cards."

*Mukherjee* is similarly instructive. There, the patent-in-suit was directed to battery cathodes. While the claims covered all types of cathodes, the specification only described a subset of cathodes known as Electroactive Transition Metal Chalcogenide (ETMC)

cathodes.  *See Mukherjee*, 217 F. App'x at 973.  The Federal Circuit found that the composition of the cathodes was critical to the invention because the specification expressly distinguished ETMC and non-ETMC cathodes based on known problems with non-ETMC cathodes.  *See generally id.*, at 974-77.  Thus, the Court concluded that the specification did not support the full scope of the claims, and, as a result, the patent was invalid for lack of written description.  *See id.* at 972, 976-77.

Here, the specification explains at length the problems associated with reaching consumers in the credit card industry.  In particular, it focuses on the limitations associated with mass-consumer mailings of financial card solicitations.  It does not indicate that other types of financial instruments—such as mortgages or home equity loans—were traditionally marketed in the same manner or faced the same marketing problems.  There is nothing in the specification that would convey to one of ordinary skill in the art that Block was in full possession of the claimed electronic system and method for retrieving and displaying "financial offers" as of the applicable filing date.  There can be no dispute that, at most, the specification conveys that the sole inventor of the '617 Patent, G. Cotter Cunningham was in possession of a method and system directed to financial cards.  Mr. Cunningham's own sworn testimony is probative of this point.  He testified that he had no memory of being in possession of the subject matter covered by the "financial offering" claims of the '617 Patent as of the actual 1996 filing date from which priority is claimed, and further testified that he has no written evidence that he thought of or conceived of using the claimed invention for financial products other than financial cards.  Kwong Dec., Ex. E at 157:21-25, 158:11-19.

In sum, the metes and bounds of the "financial offerings" claims far exceed the disclosure in the specification of the patents-in-suit. Those claims of the '617 Patent are, therefore, invalid for lack of written description.[4]

## V.      Conclusion

For the foregoing reasons, independent claims 11 and 19 and dependent claims 13-17, and 21-25 of the '617 Patent are invalid for lack of written description under 35 U.S.C. § 112, ¶ 1 and, therefore, the Court should grant LendingTree, LLC's motion for summary judgment of invalidity.

Respectfully submitted,

Dated:  June  19, 2009                                   /s/  Robert D. Fram

Robert D. Fram (Admitted Pro Hac Vice)
Winslow B. Taub (Admitted Pro Hac Vice)
Deanna L. Kwong (Admitted Pro Hac Vice)
**COVINGTON & BURLING LLP**
One Front Street, Floor 35
San Francisco, CA 94111
Tel: (415) 591-6000 / Fax: (415) 591-6091
rfram@cov.com
wtaub@cov.com
dkwong@cov.com

---

[4]      In the alternative, if the Court finds that the "financial offering" claims themselves provide their own written description, then the effective date for those claims would be the date that the applicant's communication adding the "financial offering" claims was received by the PTO, which was February 8, 2002.  *See* 37 C.F.R. Section 1.8(a)(2)(i)(A); *see also In re Curtis*, 354 F.3d 1347, 1351-53 (Fed. Cir. 2004) (deeming the filing date of the later application as the effective date of the new claims where the parent did not support the new claims); *Tronzo*, 156 F.3d at 1158-60 (same); *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1301, 1306-11 (Fed. Cir. 2008) (same); Kwong Dec., Ex. D-2.

Edward H. Rippey (Missouri Bar No. 46889)
**COVINGTON & BURLING LLP**
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401
Tel: (202) 662-5171
Fax: (202) 778-5151
erippey@cov.com

Edward R. Spalty (Missouri Bar No. 26086)
David A. Jermann (Missouri Bar No. 51389)
ARMSTRONG TEASDALE LLP
2345 Grand Boulevard, Suite 2000
Kansas City, Missouri 64108-2617
Tel: (800) 243-5070 / Fax: (816) 329-5426
espalty@armstrongteasdale.com
djermann@armstrongteasdale.com

ATTORNEYS FOR LENDINGTREE, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of LENDINGTREE, LLC'S

SUGGESTIONS IN SUPPORT OF LENDINGTREE, LLC'S MOTION FOR PARTIAL

SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. SECTION 112, ¶ 1 FOR

LACK OF WRITTEN DESCRIPTION was electronically filed with the Clerk of Court on this

19th day of June, 2009 using the CM/ECF system, which sent notification of such filing to the

following:

Jeffrey S. Standley
F. Michael Speed, Jr.
Mark R. Engle
STANDLEY LAW GROUP LLP
6300 Riverside Drive
Dublin, OH  43017
Tel.:  614-792-5555
Fax:  614-792-5536
jstandley@standleyllp.com
mspeed@standleyllp.com
mengle@standleyllp.com

Kenneth W. Brothers
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006
brothersk@dicksteinshapiro.com

Mark W. Brennan
BRYAN CAVE LLP
3500 One Kansas City Place
1200 Main Street, Suite 3500
Kansas City, MO  64015-2100
Tel.:  816-374-3200
Fax:  816-374-3300
mwbrennan@bryancave.com


        /s/ Robert D. Fram

ATTORNEY FOR LENDINGTREE, LLC